### NEW YORK CENT. & H. R. R. CO. v. BANKER.

(Circuit Court of Appeals, Second Circuit. June 22, 1915.)

#### No. 249.

1. MASTER AND SERVANT ⬅286—ACTIONS FOR DEATH—QUESTIONS FOR JURY.

In an action for the death of a railroad engineer, whose train was derailed by a derailing device intended to minimize disaster by preventing trains on a side track from running onto the main line in case danger signals failed to work or were disregarded by the engineer, evidence *held* to make a question for the jury as to whether the signals were so operated as to mislead the engineer, and lead him to believe that the track was clear.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 1001, 1006, 1008, 1010–1015, 1017–1033, 1036–1042, 1044, 1046–1050; Dec. Dig. ⬅286.]

2. MASTER AND SERVANT ⬅286—ACTIONS FOR DEATH—QUESTIONS FOR JURY—SIDING.

A railroad engineer was killed by the derailment of his train at a point where a side track nine miles long ran into the main track; the switch then being set to run his train onto a derailing device to keep the main track clear for a passenger train. There were two types of derail in common use; one, varying in length from 2 or 3 feet to 15 or 18 feet, being usually used in yards, and the other, from 50 or 60 feet to 250 or more, being generally used where main tracks came together. It was clear, however, that whether a track was a "siding" depended upon the use made of it, rather than its length, and that the long type of derail was used when the track was one on which trains might be expected to run at a high speed, and the other type where they were confined to a low speed. *Held,* that the question of which type should have been used at the par-

ticular place was an engineering problem, which should not have been left to the jury's decision.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 1001, 1006, 1008, 1010–1015, 1017–1033, 1036–1042, 1044, 1046–1050; Dec. Dig. ☜286.]

In Error to the District Court of the United States for the Southern District of New York.

This cause comes here upon appeal from a judgment entered upon the verdict of a jury in favor of defendant in error, who was plaintiff below. The action was brought under the federal Employers' Act to recover damages resulting from the death of Timothy S. Banker, a locomotive engineer, who was killed by the derailment of a train he was running.

Alex. S. Lyman, of New York City (Robert A. Kutschbock, of New York City, of counsel), for plaintiff in error.

Edwin W. Sanford, of Albany, N. Y. (John Vernou Bouvier, Jr., and Wm. Montague Geer, Jr., both of New York City, of counsel), for defendant in error.

Before LACOMBE, WARD, and ROGERS, Circuit Judges.

LACOMBE, Circuit Judge. The accident happened on the Hudson River Railroad at Castleton, about nine miles south of East Albany, where the tracks run on an embankment parallel to and several feet above the river. Movement of trains on the south-bound (westerly) track, on which all passenger trains run, when not on sidings, is regulated by a succession of semaphore signals on tall posts, which inform the engineer whether the block ahead of him is clear or closed—i. e., occupied by another train. These signals at the block in question are operated from a tower (No. 95). Running alongside of the south-bound main track and to the west of it is another track, called by the employés the "hog track," and used by freight trains. This track runs into the main south-bound track a little over 100 feet north of the tower. Trains on the side or hog track are forbidden to exceed a speed of 15 miles an hour; their movement is regulated by a succession of signals, located west of the track on posts much lower than the main semaphore posts, known as "dwarf" signals. These also are operated by the same towerman, who receives word from a tower or towers to the north of him when a south-bound train is approaching, either on main or on side track. The accident occurred about 4 a. m., and the signals were differently colored lights. All signals, at normal, are such in position or color as indicate "danger"; they can be changed to "safety" only by the movement of levers by the man in the tower. About 50 feet south of the last dwarf signal by the side track, said track runs into the main track over a switch, which also is operated by a lever under the control of the towerman. When it is moved one way, the switch leads the train from the side track to the main one; when it is moved the other way, it leads the train into what is called a "derail." This is a device to minimize disaster. Should the dwarf signals fail to work, or should the

engineer disregard them and run on, instead of stopping his train, it will in a very few feet run off the rail heads into open ground, where there is no roadbed, and after plowing along a bit will perforce have to stop and may be wrecked. But by so doing the risk of precipitating it into the side of a crowded passenger train is avoided. The levers and all the operating parts are ingeniously co-ordinated with each other, so as to eliminate as far as possible any carelessness on the part of the towerman. For instance, the switch leading from side to main track being in place and the main track signals indicating danger, the towerman cannot move the levers which change these signals to safety, until he has first moved the lever which throws the switch from main to derail, and has thus eliminated all chance of a train from the side track crashing into the train on the main which the safety signals invite to proceed, often at a high rate of speed. There is nothing in the testimony to suggest that this interlocking mechanism controlling signals and rails was not in perfect order on the night of the accident. Indeed, no charge of that sort was made in the complaint.

What happened was this: A freight train, of which deceased was the locomotive engineer, came down this side track from East Albany to the place of the accident. In the cab with deceased were three other men; he was on the right-hand side, where he could look ahead and pick up the series of dwarf signals; the speed of the train did not exceed the 15 miles which the rules required, probably it was nearer 10 miles an hour. Turning a curve about 1,000 feet above the dwarf signal near tower 95, the train ran upon a straight tangent, which led down to the switch between main track and derail. About the time the train ran upon this tangent the sound of a train on the south-bound main track was heard in the cab. The deceased was at his post, awake, and apparently attentive—he answered a question of one of the men in the cab as to the time. He ran the train, without further reducing speed or stopping, past the dwarf signal, and, the derail being open, it ran off the tracks, and after going a few feet along the untracked ground turned over to the right and fell on the slope, killing Banker, who was found with his hand on the throttle. The question whether or not deceased was negligent was a prominent one in the case. The theory of defendant was that from the time Banker rounded the curve onto the tangent he was confronted with a danger signal (purple light) on the dwarf post, but disregarded it and ran past through the derail. The theory of plaintiff was that no danger signal was displayed to him. The evidence tending to show that the light on the dwarf signal was purple (danger) was direct. The evidence tending to show that the light was green (safety) was inferential. It was contended that an experienced engineer, familiar with the locality, as he was, would not have run past a danger signal, especially when he heard (as presumably he did, since a witness in the cab heard) the rumble of a train on the main track next to him. The verdict gives us no enlightenment as to what conclusion the jury reached as to the alleged negligence of deceased. The action was under the federal Employers' Liability Act, which provides that contributory negligence shall not defeat recovery, but may require an apportionment of damages. The verdict was for

$14,500, and no one can tell whether that sum indicates full damages, or apportioned damages. Incidentally it may be remarked that it will be helpful in all trials under this act to have the jury indicate whether they find negligence on the plaintiff's side, and, if so, by how much they have reduced the verdict against defendant.

The charges of negligence are two-fold:

A. That the signals were so operated as to mislead deceased.

B. That the derail was of a type which it was negligent for defendant to maintain at the place in question.

[1] A. The normal signal on the dwarf post was danger (purple), indicating that the switch was closed to main track and opened to the derail. It was physically impossible for the towerman to change that signal to green (safety) until after he had moved the lever which turned the switch from derail to main track. The evidence to support the theory that there was a green light on the dwarf signal from the time the train left the curve till it passed the switch is, as we have seen, inferential only; but the jury was warranted in considering it for what it is worth. One witness, the head brakeman, who was in the cab, testified on a former trial, and his evidence was read in the case at bar. As printed in the record at folio 203, it would seem to indicate that he saw a purple light on the dwarf post; but we are rather inclined to think that there is some confusion in reporting or transcribing what he said—that he was speaking generally as to what signals would be shown. He was on the left-hand side of the cab, not watching the dwarf signals to the right of the track. The defendant called Smith, the towerman, who testified over and over again that after he got there that night, not long before the accident, the dwarf signal was normal (danger, purple light), and that he did not change it down to the time of the derailment. Of course, if this were so, the accident happened because deceased ran past a danger signal which had been opposed to him for 1,000 feet. This would mean, not merely that he was negligent, but it would account for the derailment without any negligence on the part of defendant touching the exhibition of signals.

However, the towerman was an interested witness, human life was lost, and he was anxious to clear himself of responsibility therefor. The jury could give that circumstance proper weight, especially since he admits that at one time after he saw the freight coming he started to change the situation by closing the passenger track and opening the freight track; that he got so far in effecting this change that he had the home and distant signals on main back set at normal, which would stop the passenger train; that he then changed his mind, and cleared the passenger track again by restoring the home signal to come on. Incidentally the engineer of the freight train might have seen the change of passenger track semaphore from clear to danger, and have supposed it would naturally be followed immediately by the change of his own signal from danger to clear. The jury might think these sudden changes on the eve of catastrophe were careless, and that defendant should be held liable for thus misleading deceased to suppose that he could safely continue speed, and would find his last dwarf signal showing safety by the time he reached it. Indeed, the jury might have

altogether disbelieved the towerman, and reached the conclusion that his first intended change was carried to completion, main track closed, and side track opened, and that thereafter he tried to change back again, having in the meantime misled the engineer to his destruction.

If the cause had gone to the jury solely on the first charge of negligence, the evidence is such that we would not be warranted in disturbing its finding. But both charges of negligence were sent to them, and we must therefore consider the second one.

[2] B. There are two types of derail. One, the one-point derail, is short, varying from 2 or three feet to 15 or 18 feet. The other is long, anywhere from 50 or 60 feet to 250 or more, and ending, sometimes, in a bumper or a bank of earth. Both are of common use in railroading. In yards, the short or one-point type is practically universal. Where main tracks come together, the long type is apparently generally used. The one-point seems to be generally used where "sidings" run into the main track. Much testimony was taken as to what a "siding" is, and it was strenuously contended that this nine-mile stretch of track could not properly be considered a siding. It seems quite clear from the testimony that the long rail is used when the track to which it is applied is one on which trains may be expected to run at high speed, and the one-point is used when the trains running on that track are confined to a low speed; that whether piece of track is a "siding" or not depends, not at all upon its length, but upon the use made of it. In view of the very general use of one-point derails, it seems to us that the question, which type should be used at a particular place, is an engineering problem, depending on many considerations, which should not be left to a jury's decision—at least not in a case such as the testimony in this case presents.

Because we cannot determine from the verdict which charge of negligence the jury found against defendant, there must be a new trial.

Judgment reversed.