FLORENCE E. TABER, as Administratrix, etc., of HARRY T. TABER, Deceased, Respondent, *v.* WILLIAM G. McADOO, Director General of Railroads, Appellant.

Third Department, June 30, 1919.

Railroaa — negligence — unsafe place to work — freight platform covered by canopy — test of negligence — evidence not sustaining plaintiff's theory of case — finding of defendant's negligence disapproved.

In an action to recover for the death of a trainman, claimed to have been caused by his coming in contact with the overhang or canopy of a railroad freight house, while he was engaged in work on a freight car along a track adjoining said freight house, it appeared that the defendant maintained a freight platform covered by a canopy which reached to within a few inches of the line of the eaves of freight cars standing on an adjoining siding and from twelve to twenty-four inches higher than the roof of the cars; that said canopy was erected to protect workmen from storm while unloading freight; that it did not overhang the cars and was a large structure easily seen and with which the decedent was familiar, it being a part of his duties to load and unload freight at the platform.

*Held,* that the test of the defendant's negligence is not what would have made the accident impossible but whether the structure was, in view of the object to be accomplished, one which involved the exercise of reasonable care in providing a reasonably safe place for the decedent to discharge his duties and at the same time fulfill its purpose;

That negligence cannot be predicated upon the existence of such a structure;

That said structure was not a wholly unnecessary danger and did not involve the neglect of any duty which the defendant owed to plaintiff's intestate;

That plaintiff's theory that the decedent came to his death by coming in contact with the canopy and falling from the car was not sustained by the evidence;

That a finding that defendant was guilty of negligence is disapproved.

APPEAL by the defendant, William G. McAdoo, as Director General of Railroads, from a judgment of the Supreme Court in favor of the plaintiff, entered in the office of the clerk of the county of Chemung on the 9th day of December, 1918, upon the verdict of a jury for $12,500, and also from an order entered in said clerk's office on the 17th day of February,

1919, denying defendant's motion for a new trial made upon the minutes.

*Stanchfield, Lovell, Falck & Sayles* [*Halsey Sayles* of counsel], for the appellant.

*Mortimer L. Sullivan,* for the respondent.

Woodward, J.:

By stipulation this case comes under the Federal Employers' Liability Act (35 U. S. Stat. at Large, 65, chap. 149, as amd. by 36 id. 291, chap. 143); and the plaintiff's intestate met his death at Bath, on the 28th day of June, 1918, while working as a trainman for the defendant, on a train known as the local freight and pick-up. This train ran from Groveland to Elmira, on the Delaware, Lackawanna and Western railroad, and its purpose was to distribute and pick up local freight which either had been or was designed to be placed in through trains for larger transportation. This train usually found an hour or more of work to be done at Bath, and the decedent had, off and on, worked on this train for a considerable period prior to the accident in question. The defendant's railroad passes through Bath from east to west. The freight station is south of the main tracks. There are three tracks to the north of this station. The extreme north track is the west-bound main track. The middle track is the east-bound main track, and the third is what is known as the freight-house siding. A freight house, with a projecting canopy, stands by the side of the freight-house siding, and to the west of the freight house is a platform, covered by a canopy which reaches to within a few inches of the line of the eaves of freight cars standing upon this siding, and from twelve to twenty-four inches higher than the roof of the car, depending upon its particular model. The result of this structure is, as it was obviously designed to be, that when a freight car is placed along this platform there is a practical shelter for the workmen and the goods to be handled thereon; the storm is shut out from the south by the car itself, and from overhead by the canopy, and while there is some suggestion in the case that if the canopy had been higher this particular accident could not

have occurred, the test of negligence is not what would have made the accident impossible, but whether the structure was, in view of the object to be accomplished, one which involved the exercise of reasonable care in providing a reasonably safe place for the decedent to discharge his duties and at the same time fulfill its purpose. The evidence showed the Bath station to be one which involved the handling of a considerable volume of freight, and there can be no doubt that it was the duty of the railroad company to handle this freight expeditiously and without damages; it could not wait for fair weather, and the question of negligence in the construction of this canopy-covered platform in connection with its freight house was hardly one to be determined fairly by a jury contemplating the death of the plaintiff's intestate years after the structure had been completed and where it had been in daily use with no suggestion that it involved any element of negligence for a long period of time. The complaint made no suggestion of any defect in the engineering features of the railroad; it merely alleged upon information and belief " that on said 28th day of June, 1918, while working on said train at and near the place [Bath] aforesaid, plaintiff's intestate was so badly injured by the defendant's engine and cars by virtue of and through the negligence and carelessness of the defendant, its officers, agents, employees and servants, that as a result thereof, he was so grievously injured that the following day he died," and while no point was made of this upon the trial, the situation should be taken into consideration in determining the law of this case. The canopy might have been constructed higher, but to have done so would have defeated the very object of its construction, and there is no sanction for predicating negligence upon the theory of what might have been done to prevent the particular accident after it has happened; the question is what reasonably prudent men, looking at the situation before the accident, would have concluded; and, tried by this test, it is difficult to understand how a jury could reach the conclusion that this practical device for facilitating the proper handling of freight at this particular station involved the neglect of any duty which the defendant owed to the plaintiff's intestate. This canopy was not along the main tracks; it was constructed for the purpose

of the railroad along a freight siding. It did not overhang the cars upon which the decedent was called upon to work. It was a large structure, which could not fail to be seen by any one in the vicinity; the intestate was familiar with the yard and with the work. There was nothing concealed about it, and it was a part of his duties, not only to assist in shifting the freight cars, but in loading and unloading freight at this platform, and he had a full opportunity of knowing all that the defendant is presumed to have known about the conditions prevailing in this place. There was not, as in the case of *Choctaw, Oklahoma, etc., Railroad Co.* v. *McDade* (191 U. S. 64) a wholly unnecessary danger. " Where no necessity exists," say the court in the cited case, " as in the present case, for the use of dangerous appliances, and where it is a matter requiring only due skill and care to make the appliances safe, there is no reason why an employé should be subjected to dangers wholly unnecessary to the proper operation of the business of the employer." This rule is, of course, good law. In the case cited the railroad company maintained a water tank along the main line of the railroad, with the feeding spout projecting out over the cars at an angle which involved danger to every man riding on top of the cars, and the negligence must have been obvious to any intelligent man at any time, and it was not a case for holding that the employee had accepted the risks, for the danger was one which could not be presumed to have been taken into account. " It is a case," say the court, " where the dangerous structure is not justified by the necessity of the situation. * * * The servant assumes the risk of dangers incident to the business of the master, but not of the latter's negligence," and this is clearly the distinction between the case at bar and the *Choctaw* case.

The distinction is not quite so obvious in the case of *Texas & Pacific R. Co.* v. *Swearingen* (196 U. S. 51) where the injury resulted from contact with a scale box in the yard where the plaintiff was discharging his duty, but it is entirely clear that the case, which was a close one, turned upon the fact that the scale box was a comparatively small structure, which would not necessarily come within the observation of an employee whose attention had not been specially called to

it. " The Court of Appeals was of opinion, and rightly we think," say the court in the case distinguished, " that the dangerous contiguity of the scale box to track No. 2, and the extra hazard to switchmen resulting therefrom, was not so open and obvious on other than a close inspection, as to justify taking from the jury the determination of the question whether there had been an assumption of the risk. The plaintiff was entitled to assume that the defendant company had used due care to provide a reasonably safe place for the doing by him of the work for which he had been employed, and as the fact that the defendant company might not have performed such duty in respect to the scale box in question was not so patent as to be readily observable, the court could not declare, in view of the testimony of the plaintiff as to his actual want of knowledge of the danger, that he had assumed the hazard incident to the actual situation."

The discussion so far has proceeded upon the assumption that the canopy-covered freight platform was the proximate cause of the death of plaintiff's intestate; that in passing along this freight siding the intestate came in contact with the canopy top and was thrown to the platform and thence to the ground, sustaining injuries producing his death, and it seems to us that were this in fact true, it would not involve the defendant in liability, for the reasons already suggested. The danger to be apprehended along this freight siding was entirely open and obvious, and it existed in connection with a necessary provision for the expeditious and proper handling of the traffic at this point, and it was a danger which could not be encountered except in extraordinary circumstances, necessarily involving carelessness on the part of one familiar with the situation and intelligently making use of his eyes. At the time of this accident the defendant was moving a single freight car, attached to an engine. The engine was backing to the eastward, drawing the freight car upon which the intestate was located in the discharge of his duty. George McGrain, who was the only eye-witness, and whose testimony is not discredited, had charge of the engine. Between him and the freight car was the tender, and the plaintiff's witness, Pelone, claims to have been standing upon the bumper of this

tender and the iron step upon the ladder at the end of the car forward at the time. Pelone testifies that when the car had reached a point near the west end of the canopy he heard a crash and that Taber (the intestate) fell upon him and then out from between the tender and the car to the platform and thence to the ground. Pelone does not claim that he saw Taber come into contact with the canopy; he merely says he heard a crash, followed by Taber falling upon him. Taber could not have been hit by the canopy if he had been on top of the car; the plaintiff's theory is that he was upon the ladder at the side, not at the end of the car, and that in this position his head came into contact with the canopy, with the result stated above. But if the decedent had been on the side of the car, with his head up high enough to hit the canopy in the manner claimed, it takes some measure of credulity to believe that he could have fallen upon Pelone, who claims that he was between the car and the tender, and the photograph in evidence shows his head well up toward the top of the car. We are wont to believe in a curved ball in the great national game, but the idea that the decedent's body could have turned an abrupt corner and fallen on the witness Pelone only two or three feet below where the decedent's head must have been if it actually came into contact with the canopy is asking for a good deal of faith in a mere hypothesis, where it is in direct conflict with the testimony of an actual eye-witness, who tells an entirely probable story in a frank and candid manner. McGrain, the eye-witness, says that Taber was at the west end of the car when the particular movement from the hay switch began; that he came to the east end of the car, which was immediately behind the tender, and in full view of the witness, and started to climb down the ladder at the east end, and not the side, of the car, with the result as heretofore stated. " We were backing up as we came over the crossing," says this eye-witness; " he started back to the east · end of the car and he got to the east end; he started down between the tank [or tender] and the car over the end ladder and the next I saw he was falling, fell down and dropped out on the platform," and when asked the direct question whether Taber's head came into contact with the canopy he answers, " No, sir." And upon cross-examination he renews the answer,

without anything to suggest that he is untruthful, and he likewise says that he is " sure of this fact." This witness says that he heard no crash such as is testified to by Pelone, but in all other respects the testimony is harmonious with the latter. Pelone says that Taber fell upon him and then fell out upon the platform, and it would be very much more in reason to believe that Taber fell from the end ladder directly upon Pelone, than that he fell around an abrupt angle and upon him from the ladder on the side. Moreover, Pelone does not attempt to say that Taber's head was crushed as it must have been if the crash which he describes had been of great violence. What the crash was he does not pretend to say. It may have been that Taber slipped or stumbled and made what Pelone describes as a crash, or there may have been a crash in the freight yard entirely apart from the accident. He says he was dazed by what occurred, and what he describes as the crash preceding the fall may have been merely the fall itself, coupled with the scramble of Taber to prevent the accident. Pelone does not say that Taber was on the side ladder; no witness saw him on the side ladder, and McGrain declares positively that he was upon the end ladder, and he is the only person who makes any claim to have seen the decedent at the moment just preceding the fall. We cannot discredit this evidence, undisputed by any fair inference. Pelone's testimony is not out of harmony with that of McGrain; it corroborates it in every essential particular, except as to the crash, which might have been comparatively trifling. The decedent's head was bruised; he was found to have come to his death by a concussion of the brain, but there is no evidence that the injury to the head came from contact with the canopy, and the description of what took place after the fall is sufficient to fully account for any injuries which are disclosed by the record. Without the testimony as to the crash there is nothing from which any inference may be drawn that the decedent came into contact with the canopy, and the description of the injuries actually developed do not support the theory that there was any such crash as compels us to assume a practically impossible result, where a credible eye-witness tells us of what actually occurred, which is consistent with all the rest of the testimony. The judgment and order appealed from should be reversed,

and a new trial granted, with costs to the appellant to abide the event.

All concurred.

Judgment and order reversed on law and facts, and new trial granted, with costs to the appellant to abide the event. The court disapproves of the finding that the defendant was guilty of negligence.