MARGARET H. FORD, as Administratrix of the Estate of TRUMAN C. FORD, Deceased, Respondent, *v.* WILLIAM G. McADOO, Director-General of Railroads, Appellant.

Negligence — railroads — Federal Boiler Inspection Act — hook near bottom of tender on which to hang pail when drawing water not a dangerous contrivance within the meaning of Federal Boiler Inspection Act.

1. In determining a question of proper conditions and safety under the Federal Boiler Inspection Act (36 Stat. at Large, 913, amd. 38 Stat. at Large, 1192), that mechanism which has been in constant use for years without causing injury must be considered proper and safe until some notice or occasion indicates its danger and insufficiency.

# 156          Ford v. McAdoo.

2. Plaintiff's intestate, the head brakeman on a train, stepped therefrom as it was slowing down and, after it had stopped, was found alongside with injuries from which he died. After the accident a small piece of cloth similar to the overalls worn by intestate was found upon a small hook near the bottom of the tender placed there for the purpose of hanging a pail when water was to be drawn from the tank. The theory of the plaintiff was that intestate stepped off the engine, was caught by this hook, dragged against the gussets of a bridge and thrown under the wheels. It was contended that the hook was a dangerous contrivance rendering the engine and tender unsafe within the meaning of the Federal Boiler Inspection Act as amended. *Held*, error; that where the locomotive maker was a reputable concern, the device one which it had planned as giving the best service for the purpose and one which had been in use for years without accident and which in connection with the engine and tender had been inspected by Federal inspectors and passed as complying with the law, the plaintiff failed to make out a cause of action; that the placing of the water opening at the side of the tender was a matter of engineering judgment and that there was no evidence to show that the engine or tender was imperfect, unsafe or improper within the meaning of the act of congress.

*Ford* v. *McAdoo*, 190 App. Div. 884, reversed.

(Argued March 17, 1921; decided May 3, 1921.).

APPEAL from a judgment of the Appellate Division of the Supreme Court in the third judicial department, entered December 15, 1919, affirming a judgment in favor of plaintiff entered upon a verdict.

*Halsey Sayles* for appellant. Plaintiff failed to prove either any negligence or any violation of the amended Boiler Inspection Act. (*C. & E. I. R. Co.* v. *Driscoll*, 52 N. E. Rep. 921; *Tuttle* v. *D. G. H. & M. Ry. Co.*, 122 U. S. 189; *N. Y. C. & H. R. R. R. Co.* v. *Banker*, 224 Fed. Rep. 352; *B. & O. R. Co.* v. *McOsker*, 88 N. E. Rep. 950.) There is no proof that the negligence, if any, was the cause of the accident. (*White* v. *L. V. R. R. Co.*, 220 N. Y. 131; *Francey* v. *Rutland R. R. Co.*, 222 N. Y. 482; *Wendell* v. *Leo*, 195 N. Y. 76; *Albring* v. *N. Y. C. & H. R. R. R. Co.*, 46 App. Div. 460; *White* v. *N. Y. C. & H. R. R. R. Co.*, 68 App. Div. 290.)

*Mortimer L. Sullivan* for respondent. Plaintiff established that the defendant violated the amended Boiler Inspection Act and the defendant was guilty of negligence outside of such act. (*Kline* v. *Penn. R. R. Co.*, 181 App. Div. 203; *St. L. & I. M. Ry. Co.* v. *Taylor*, 210 U. S. 294; *Martin* v. *Herzog*, 228 N. Y. 164; *T. & P. R. R. Co.* v. *Rigsby*, 241 U. S. 33; *S. A. Ry. Co.* v. *Wagner*, 241 U. S. 484; *Wabash Co.* v. *United States*, 172 Fed. Rep. 864; *C., B. & Q. Ry. Co.* v. *United States*, 220 U. S. 559.) The negligence of the defendant company and its disregard of the Safe Engine Act constituted the proximate cause of the killing of plaintiff's intestate. (*Irish* v. *Union B. & P. Co.*, 103 App. Div. 45; 183 N. Y. 188; *Russell* v. *Erie R. R.*, 177 App. Div. 13; *T. & P. Ry. Co.* v. *Harvey*, 228 U. S. 324; *C., O. & G. R. R. Co.* v. *McDade*, 191 U. S. 64; *McHugh* v. *Manhattan Ry. Co.*, 179 N. Y. 378; *Wazenski* v. *N. Y. C. & H. R. R. R. Co.*, 180 N. Y. 466; *Clark* v. *International Paper Co.*, 139 App. Div. 375; *Marus* v. *N. Y. C. R. R. Co.*, 170 App. Div. 158; *Johnson* v. *H. R. R. R. Co.*, 20 N. Y. 65; *Galvin* v. *Mayor, etc.*, 112 N. Y. 223.)

CRANE, J. The plaintiff in this case as administratrix of the estate of Truman C. Ford, deceased, has recovered a verdict against the defendant representing the Delaware, Lackawanna and Western Railroad Company for damages caused by the killing of her husband on April 29th, 1918.

Ford was in the employ of the railroad company as head brakeman on a freight train which left Buffalo for Elmira at seven o'clock in the evening of that day. At about 3:00 A. M. in the morning, as the train was coming into Wallace, a signal from the caboose notified the engineer that an emergency had arisen requiring him to stop. The train consisted of seventy-three cars drawn by engine 1206.

Ford was sitting in his usual place on the left-hand side in the engine. It was he who told the engineer

[231 N. Y. 155]        Opinion, per CRANE, J.        [May,

and fireman about the signal and to stop the train. As the train slowed down coming to a stop going not faster than two or three miles an hour it was approaching a bridge sixty-five feet in length. This bridge was a girder bridge supported by three girders; that is, the tracks ran between two girders which were twelve feet, one inch apart. These girders were five feet, six inches high. There was no floor to this bridge. Beams ran across from the center girder to the girders on the sides. From the girders there extended down slantwise sixteen braces or gussets to which the beams were fastened. Under each rail there was an iron girder running lengthwise supported by these beams attached to the gussets. The ties were from eight to ten inches apart.

As trains entered upon the bridge they passed between these two upright girders. The gussets were wider at the bottom than at the top, that is they came out near to the rail or ties at the bottom of the bridge. The distance between the sides of the train and the girder with the gussets was, therefore, very narrow, and narrowed to seven inches at or near the bottom step of the engine. It was never intended that any one should step from a train to the bridge as there was scarcely a place to stand. The distance from the side of the tender to the top of the girder was given as sixteen and one-half inches. From the deck or floor of the engine three steps led to the ground. From the bottom step the distance as stated to the gussets was seven inches. The photographic exhibits clearly illustrate the place. It will thus be appreciated, if this description is understood, that a person stepping off the engine on to the bridge with the train in motion would be very apt to strike a passing gusset which came within seven inches of the step. It would be almost impossible to escape injury.

This was the bridge which the train was approaching or crossing when the engineer slowed down in response to Ford's direction. When the train stopped it was about

1921.]            Opinion, per CRANE, J.        [231 N. Y. 155]

two car lengths from the further end of the bridge. The train was going from west to east, and the engine was, therefore, about two car lengths distant from the easterly end of the bridge.

After Ford had notified the engineer and fireman of the caboose signal, he took his lantern and proceeded to get off the engine. The train was then in motion, but where it was in reference to the bridge no one seems to know. When the train had stopped, Ford was found on the girders of the bridge alongside the train between the middle and easterly end. Both his legs had been cut off. He was hurried to the hospital and shortly thereafter died.

Back of the engine at the bottom of the tender was the water tank. At the left-hand corner of the tender on the outside was an opening leading into the water tank and above this was a hook upon which to hang a pail. A grabhandle was on the tender leading down from the deck of the engine. This hook in question was twenty-three and one-half inches back from the grabiron on the left-hand side of the tender and eight inches from the bottom of the tank and tender. It was a little hook just large enough to take the wire handle of a pail. Its dimensions are given as extending up vertically one and one-eighth inches and sticking out from the side of the tank one and one-quarter inches. The hook bent upwards, not sideways. The hook did not come to a point but was blunt like the end of one's finger. Above the rail the hook was four feet, nine inches.

After the accident there was found on this hook a small piece of blue cloth striped with white similar to the overalls worn by Ford.

The theory of the plaintiff was that Ford stepped off the engine before he reached the bridge, was caught by this hook and dragged into the gussets of the bridge and thrown under the wheels of the car. This hook, it is said, was a dangerous contrivance rendering the engine

and tender unsafe and improper within the meaning of the Boiler Inspection Act of Congress, as amended. (Act Feby. 17, 1911, chap. 103, § 2, amended by act Mar. 4th, 1915, chap. 169, § 1.) This act makes it unlawful for any common carrier to use any locomotive engine unless the boiler and appurtenances thereof are in a proper condition and safe to operate. The amendment to the act makes it apply to the entire locomotive and tender and all parts and appurtenances thereof. The act also provides for an inspection by officials of the government in accordance with the provisions of the act.

The plaintiff recovered her verdict against the defendant upon the grounds before stated.

In my judgment there are two difficulties in the way of such a recovery.

*First.* There is no evidence to show how the accident happened and no evidence from which a reasonable inference may be drawn that the deceased stepped from the train before it reached the bridge.

*Second.* There is no evidence to show that the engine or tender were imperfect, unsafe or improper within the meaning of this act of Congress.

As to the first objection: A careful reading of the record discloses that no one knows where the train was when the deceased stepped from the engine. It had slowed down to two or three miles an hour and stopped after the engine had gone two car lengths over the farther end of the bridge. The deceased was found between this far end of the bridge and the center thereof. His legs were cut off between the knee and the thigh, but there appears to have been no injury to the head or trunk of the body. It seems hardly possible that if his clothes had caught in the hook before he reached the bridge he could have gone past so many gussets only a few inches from the side of the car without mangling all his body.

It is a mere surmise from the finding of the piece

1921.]        Opinion, per Crane, J.        [231 N. Y. 155]

of cloth on the hook that the hook was the immediate or proximate cause of the accident. Perhaps such an accident could happen in this way, but the question is, did it happen in such a way and does the evidence warrant such a conclusion and inference. That a person stepping from the engine would step out and beyond a little hook, twenty-three and one-half inches from the grabiron, may be a matter of argument and not a conclusive answer to the proposition. It might be possible, under some circumstances, for some portion of the clothing to catch. It is just as likely, however, that a person stepping off from the engine into the gussets on the bridge would be thrown against the side of the tender and thus catch on the hook. In the absence of any evidence to explain how the deceased's clothing caught in the hook or to tell us where he was at the time he stepped from the engine, it is, I think, just as reasonable to suppose that his clothing caught in the hook under the latter conditions as upon the theory assumed by the plaintiff.

In the face of two reasonable inferences, each of which is consistent with the happening of the accident, the plaintiff has failed to meet the burden which the law places upon her. Her counsel concedes that if the deceased stepped from the engine on to the bridge there could be no recovery as he must have been killed by reason of the gussets which he struck. The plaintiff has failed to furnish any evidence that the deceased was caught by the hook while stepping from the train and drawn on to the bridge, nor is there any evidence that the train was not on the bridge when he stepped off. The inference to be drawn from his clothing on the hook may be that Ford stepped on to a gusset and was thrown on to the hook, or it may be that he caught on the hook and was drawn into the bridge. One is as reasonable as the other, neither preponderates in weight of argument or likelihood.

11

When inferences are thus clearly consistent, the one with liability and the other with no cause of action, the plaintiff has not met the burden which the law places upon her. (*White* v. *Lehigh Valley R. R. Co.*, 220 N. Y. 131; *Francey* v. *Rutland R. R. Co.*, 222 N. Y. 482.)

With this view of the case some of my associates do not agree.

As to the second objection: There was nothing out of repair on this engine and tender. The hook was a mechanism devised by the American Locomotive Company which manufactured the engine and tender. The water was drawn off into pails as emergencies arose while the train was in motion for the purpose of cooling hot journals and the like. The man leaned down from the step of the engine holding on to the grabhandle, hooked the pail on to the side of the tender, then by means of a valve at the top of the tank turned on the water. This device was in use upon many engines of the Delaware, Lackawanna and Western Railroad Company and upon some of those of the Baltimore and Ohio.

The locomotive maker was a reputable concern of wide reputation as a locomotive builder, and the device was one which it had planned as giving the best service for the purpose. It was as much a part of the construction as was the grabhandle or size of the tender. This device had been in use for years without causing any accident. No danger had ever arisen from it. It had served its purpose and caused no harm so far as the evidence in this case shows. The inspectors of the United States government, under the act in question had examined this engine and tender and had passed them as complying with the law. It is true that upon other lines such as the Erie, New York Central, Pennsylvania and Lehigh Valley the water was drawn from inside the tank, but this system also had its objections. Sometimes the deck of the engine would become wet, the water freeze and standing become slippery. The placing of the water

opening at the side of the tender was a matter of engineering judgment. It may be that opinions vary as to the best method of procuring water from the tank for the purposes needed. Later inventions may make former uses inadequate. When it comes, however, to a question of proper condition and safety under the Boiler Act that mechanism which has been in constant use for years without causing injury must be considered proper and safe until some notice or occasion indicates its danger and insufficiency. (*Tuttle* v. *Detroit, Grand Haven & Milwaukee Railway,* 122 U. S. 189; *Chicago & E. I. R. Co.* v. *Driscoll,* 52 N. E. Rep. 921; *N. Y. C. & H. R. R. R. Co.* v. *Banker,* 224 Fed. Rep. 351.)

Under our State Labor Law requiring all machinery to be so placed and guarded as to be safe for all persons we held that the statute had application only to machinery from which, unguarded, injuries to employees might reasonably be apprehended. (*Michalski* v. *American M. & F. Co.,* 225 N. Y. 294.)

For these reasons we are of the opinion that the plaintiff has failed to make out her case and that the judgments of the lower courts must be reversed and the complaint dismissed, with costs in all the courts.

CARDOZO and ANDREWS, JJ., concur, and CHASE, J., concurs on second ground stated; HOGAN and POUND JJ., dissent; McLAUGHLIN, J., not sitting.

Judgments reversed, etc.