## TABER v. DAVIS, Director General of Railroads.

(Circuit Court of Appeals, Second Circuit.  February 20, 1922.)

### No. 168.

1. **Master and servant** ⬥285(9)—**Evidence on question whether brakeman struck against canopy over platform held for jury.**

In an action for the death of a brakeman, who had been riding on top of a freight car, and whose body, after a crash was heard overhead, fell between the car and the engine, evidence *held* sufficient to take to the jury the question whether deceased was knocked from the car by his head striking against a canopy erected over a freight platform alongside the track.

2. **Master and servant** ⬥286(8)—**Evidence on question of necessity for canopy over freight platform held for jury.**

In action for the death of a railroad brakeman, evidence that a canopy over the freight platform, which plaintiff claimed knocked decedent from the car, was the only similar structure along defendant's railroad, and was unnecessary, *held* to present a question for the jury.

3. **Master and servant** ⬥286(15)—**Whether canopy over freight platform was reasonably safe for employés held for jury.**

The question whether a canopy erected over a freight platform alongside a railroad track was reasonably safe as to employés whose duties required them to be on the tops and sides of freight cars presented no engineering or scientific problem, but could be determined by the jury without expert aid.

4. **Master and servant** ⬥288(9)—**Brakeman's knowledge of canopy over freight platform held for jury.**

Evidence that decedent had worked on the same railroad for 6 years, without showing he had worked at the point where he was subsequently killed during all of that time, though he had worked as brakeman there 6 years before his death, *held* not to show as a matter of law that he must have known of the existence and construction of a canopy over a freight platform.

5. **Master and servant** ⬥288(8)—**Brakeman's knowledge of clearance between car and canopy over freight platform held for jury.**

A brakeman, who was not shown to have been familiar with the existence and construction of a canopy over a freight platform alongside the track, and whose duties required him, after signaling for a highway crossing from the top of the car, to go down the ladder at the side of the car to turn a switch while the car was approaching the canopy, is not charged

as a matter of law with the duty of accurately calculating the clearance between the car and the canopy, so as to assume the risk of injury by striking against it.

Hough, Circuit Judge, dissenting.

In Error to the District Court of the United States for the Western District of New York.

Action at law by Florence E. Taber, as administratrix of the goods, chattels, and credits of Harry T. Taber, deceased, against James C. Davis, Director General of Railroads and Agent under Transportation Act, § 206 (41 Stat. 461). Judgment for defendant, after the court at the close of plaintiff's case had granted a motion for nonsuit, and plaintiff brings error. Reversed.

Mortimer L. Sullivan, of Elmira, N. Y., for plaintiff in error.

Stanchfield, Collin, Lovell & Sayles and Frederick Collin, all of Elmira, N. Y. (Halsey Sayles, of Elmira, N. Y., of counsel), for defendant in error.

Before HOUGH, MANTON, and MAYER, Circuit Judges.

MAYER, Circuit Judge. At about 2 p. m. on June 28, 1918, Taber, plaintiff's intestate, a trainman then and for some time in the employ of Delaware, Lackawanna & Western Railroad Company, suffered the injuries which resulted in his death. He was working on a train known as the local freight and pick-up, which in the course of its trip reached Bath, N. Y. A pick-up train is a local which picks up and sets out cars at various stations. At Bath the railroad runs east and west, and the freight station is south of the main tracks.

The theory of plaintiff's case is that Taber was struck by a canopy over a transfer platform, which was just west of the freight house and next to the freight house siding. Taber was the middle brakeman of the train, which was proceeding in an easterly direction. When it reached Bath, the orders required that the train take cars from behind the freight house. As the train entered Bath, it proceeded along the track next to the freight house and the canopy to a point easterly therefrom. The engine was then cut off and proceeded to a switch, where it took on a car, detoured around the remainder of the train, and then returned on the track next to the freight house canopy. During this time, the engine was proceeding westerly backing up and pushing this one car. Directly east of the freight house was a crossing and Taber was on the top of the car, as the crossing was approached.

"He was there like for any crossing. At a crossing it is mostly customary for a freight man to ride on top to prevent any accident."

As this movement was being made, Pelone, the head brakeman stood between the tank or tender of the engine and the car, with his right foot on the car and his left foot on the engine sill. He stood about 6 or 7 inches to a foot from the outer edge of the engine and was in this position, watching for signals from Taber on top.

"As we approached the freight house," testified Pelone, "I was standing in the same place, and I heard a crash, and it sounded overhead; so I hung on as tight as I could and a few minutes later I was hit with Taber's body on

my left shoulder and glancing my head. * * * He hit the concrete platform and it sort of rolled down in between the engine and the platform. * * * "

Pelone further testified:

"It [the crash] sounded right about the place where the canopy projects out from the freight house there."

In answer to the question, "Now, do you know what was to be done after this crossing was flagged as you had passed it?" Pelone testified:

"It was customary—in railroading you always, in backing up and trying to get in a switch, you always cut off and interlock your switch to save time; and when the engine goes by, you turn your switch. That was Taber's job when he was on the car."

The switch was on the side toward the canopy. It was the custom to get off the cars on the side where the switch, which was to be thrown, was situated and this necessitated the use of the side ladder toward the engine; i. e., the side near the end where Pelone was standing, as there was no ladder on the same side at the opposite end of the car. Taber was taken to a hospital, and later died of concussion of the brain, due to trauma.

Further description as to the locus in quo, except as to the canopy, infra, will not be useful, as the location of the tracks is understood by the litigants, and verbal description is not helpful without the aid of the diagram and photographs in evidence.

At the threshold, the question of fact on the evidence is whether Taber came in contact with the canopy, or whether the falling of his body was due to some other cause. The edge of the roof of the freight house proper was back about 18 inches to 2 feet; but according to Barton, a photographer, there was a clearance of only an inch between the edge of the canopy and one car which he observed when photographing, and no clearance in the case of another car. In other words, there was practically no clearance between canopy and car. The freight station was 112 feet long. The canopy was 62 feet long and 12 feet wide, and did not cover the entire cement platform. From the ties of the railroad track vertically to the edge of the canopy, the distance was 15 feet 3½ inches. The canopy was about a foot higher than the roof of the car on which Taber stood, and Taber's height was 6 feet. There were no telltales nor warning devices before the canopy was reached. It is stipulated that Taber and defendant were engaged in interstate commerce and that Taber was in defendant's employ.

[1] 1. The first question is whether or not Taber was struck by the canopy. No one saw the contact. While a witness, Burke, saw Taber "falling in the air," he did not see him prior thereto. Thus the evidence is that Taber, a temperate and experienced man, without physical defect, so far as the record discloses, had been standing on the roof of the car in the performance of his duty, that he was 6 feet tall, that the canopy was only a foot above the car, that there was practically no clearance between the side of the car and the edge of the canopy and that a crash was heard just about the time the car was passing the canopy, and at a time when it could reasonably be inferred that Taber, in the performance of his duty, was going down the ladder to turn

off the switch. There are other details of argumentative value, which need not be recited. The question is, not what counter arguments could be presented to a jury by defendant, but whether, on this testimony, the jury would have been remitted to speculation, or whether there was evidence upon which the jury could predicate the conclusion that the injury was caused by contact with the canopy.

We think the case at bar presents a state of facts less troublesome in this respect than those set forth in Choctaw, Oklahoma & Gulf R. R. Co. v. McDade, 191 U. S. 64, 24 Sup. Ct. 24, 48 L. Ed. 96. We have not failed carefully to consider the observations in respect of this same occurrence of the experienced judge who wrote for the Appellate Division of the Supreme Court, Third Department, in Taber v. McAdoo, 188 App. Div. 341, 177 N. Y. Supp. 104. We have not before us the testimony of McGrain, the "actual eye witness" therein referred to. But, irrespective of such testimony, we think that the physical movement of Taber's body on the evidence in this case cannot be so surely accounted for as to warrant us in holding, as matter of law, that his body did not come into contact with the canopy. Experience in the trial courts warns us that, except in the plainest cases, it is unsafe for courts to assume that the descent of a body, in circumstances such as here described, can be explained only upon one theory. The testimony, in our opinion, was of the character which invites argument pro and con, and presents a question of fact for submission to a jury.

2. The Construction of the Canopy. This is the third trial. Taber v. McAdoo, 188 App. Div. 341, 177 N. Y. Supp. 104, and 192 App. Div. 939, 182 N. Y. Supp. 953. In this case, plaintiff, for the first time, called one Mather, a civil engineer, who testified that the general practice regarding clearances of railroads in New York state from the center of the track was 8 feet lateral and 23 feet vertical, and not less than 2 feet 6 inches from the edge of the car. An examination of Mather's testimony, however, suggests serious doubt as to whether, as matter of law, he qualified as an expert, so as to testify to general railroad practice in the respects here concerned, and we think the wiser course is to disregard his testimony.

[2] The construction is simple and easy to understand. The sole purpose of the canopy was to protect from the weather the transfer platform, which was used to transfer freight from one car to another. There was testimony from which it might be argued that there was no need for the canopy, and that the work could have been efficiently done in connection with the freight house proper. With the merit of this argument we are not concerned. It is referred to solely as illustrative of the fact that there was testimony from which the jury might have determined that this is a case "where the dangerous structure is not justified by the * * * situation." McDade Case, supra, 191 U. S. 64, 24 L. Ed. 24, 48 L. Ed. 96.

Soper, who was conductor in charge of this local freight and an experienced Delaware, Lackawanna & Western employé contributed an important piece of testimony, when he stated that, so far as he knew, there was not another transfer platform on this railroad system like that here described. Thus it appears that there was evidence that this

canopy was an unusual construction on this road, that it was not a necessary requirement for this railroad operation, and that any layman could understand its construction from the testimony and from the diagram and photographs in evidence.

[3] There was not presented any engineering or scientific problem, such as is found in Tuttle v Milwaukee Railway, 122 U. S. 189, 7 Sup. Ct. 1166, 30 L. Ed. 1114; New York Central & H. R. R. R. Co. v. Banker, 224 Fed. 351, 140 C. C. A. 37; Ford v. McAdoo, 231 N. Y. 155, 131 N. E. 874; and Delaware, L. & W. Co. v. Donahue, 238 Fed. 770, 151 C. C. A. 620. On the contrary, a jury, without expert aid, could readily determine on all the facts whether the canopy was reasonably safe, as affecting an employé of this character, in view of the nature of the duties of such an employé and others similarly situated, of the operation of trains and cars of similar relevant facts and circumstances.

Probably Southern Pacific Co. v. Berkshire, 254 U. S. 415, 41 Sup. Ct. 162, 65 L. Ed. 335, is the case nearest to that at bar. In that case the arm of the postal crane was 14 inches from the window of the engineer's cab, the construction of these postal cranes was uniform and necessary for the business of the United States mail, and the deceased employé knew of the existence of the crane and could have seen it from his seat, had he looked, long before he reached it. Here there was no clearance, no similar construction on this railroad, no mechanical requirement of operation, and a debatable question of necessity for the canopy.

[4] Plaintiff testified that Taber had worked on the Delaware, Lackawanna & Western for six years, and most of the time was running between Elmira and Buffalo; but her testimony was a blank as to Taber having worked in this canopy locality. Soper, after consulting records, testified that Taber had worked with him at Bath 34 days in September and October, 1912; but there is no testimony that the canopy then existed, nor that Taber ever worked at the particular place where the canopy was, although Soper stated that Taber was a member of his crew on the local freight and that the local freight in 1912 did the "same sort of work." Soper's testimony in this respect was of the most vague and general character, and it may very well be that, when Taber passed through Bath in 1912, he was assigned to some other duty.

In Jacobs v. Southern Railway Co., 241 U. S. 229, 36 Sup. Ct. 588, 60 L. Ed. 970, it had been customary for 11 or 12 years for ashes to be accumulated upon the tracks and Jacobs testified that he had knowledge "of the cinders being there," but "had forgotten them being there at the time." In the case at bar, under the most unfavorable inference, all that can be said is that Taber might have noticed the canopy in 1912, although, of course, on this nonsuit, plaintiff is entitled to the most favorable inference from the facts. It certainly cannot be held as matter of law that Taber must have known on January 28, 1918, of the existence of a structure on which he might have been in September or October, 1912, nearly seven years before.

We have not before us the record upon which the Appellate Division

concluded that Taber "had full opportunity of knowing all that defendant is presumed to have known about the conditions prevailing in that place." On this record, there is no evidence that Taber knew about the canopy, and, so far as this record discloses, this was the first time Taber was engaged in a switching operation, which required passing this canopy.

[5] The question, then, is whether a brakeman on a moving car, with his mind concentrated on the necessity of warning as to a crossing, and on his duty of turning a switch, was bound, as matter of law, to calculate visually the clearance of the only canopy of its kind on the railroad on which he worked, and a canopy of whose existence and construction he had no previous knowledge. The mere statement of the question carries its own answer, within the authority of Texas & Pacific Ry. Co. v. Swearingen, 196 U. S. 51, 25 Sup. Ct. 164, 49 L. Ed. 382, Choctaw, Oklahoma & Gulf R. R. Co. v. McDade, supra, and Gila Valley Ry. Co. v. Hall, 232 U. S. 94, 34 Sup. Ct. 229, 58 L. Ed. 521. Cf., not on assumption of risk, but having analogous features, Chesapeake & O. R. Co. of Kentucky v. Vaughan's Adm'r, 159 Ky. 433, 167 S. W. 141.

On this branch, the case is quite different from the Berkshire case, supra. There the employé "perfectly well knew of the existence of the crane where it stood * * *"; he "had been upon this route for some years, had passed over it many times, and must be presumed to have known of the crane." Further the court said:

"He entered the employment of the railroad when it had this appliance manifest in its place. The only element of danger that he may not have appreciated was the precise distance which the point of the crane would reach. But an experienced railroad man cannot be supposed to have been ignorant that such a projection threatened danger, and, knowing so much, he assumed the risk that obviously would attend taking the chances of leaning well out from the train. As we have said, the only possible inference on the uncontradicted evidence of the plaintiff's witnesses was that he leaned out considerably more than 14 inches, as shown by the position of his body and the place of the cut on his head."

And the court reversed the judgment, "confining ourselves to the case of postal cranes. * * *"

In Taber's Case there was no knowledge, and whether the danger was "plainly observable" (McDade Case), or was "so obvious that an ordinary prudent person under the circumstances would have appreciated it" (Gila Valley Case), was on this evidence a question of fact for the jury.

Judgment reversed.

HOUGH, Circuit Judge (dissenting). This record shows no doubted or contradicted fact; yet it is said that the case must go to the jury. It seems to me the reasons why it should not are sufficiently set forth in Judge Woodward's opinion in the Appellate Division. But it is fundamentally wrong to use a jury to evade decision, and by no one has the point been better put than by Justice Holmes, as follows:

"It is a featureless generality that the defendant was bound to use such care as a prudent man would use under the circumstances; and this gener-

ality ought to be continually giving place to the specific one that he was bound to use this or that precaution under these or those circumstances. The standard which the defendant in tort was bound to come up to was a standard of specific acts or omissions with reference to the specific circumstances in which he found himself. If in the whole department of intentional wrong the courts arrived at no further utterance than the question of negligence, and left every case without rudder or compass to the jury, they would simply confess their inability to state a very large part of the law which they require the defendant to know, and would assert by implication that nothing could be learned by experience." Holmes' Common Law, p. 111.