■ JOHN F. LOPRESTO et al, as Preliminary Executors of LINDA MARTORANO, Also Known as VALERIA MARTORANO, Deceased, Respondent, v LINDA BRIZZO-LARA, Appellant. — Judgment, Supreme Court, New York County (Stecher, J.), entered on October 21, 1981, affirmed, without costs and without disbursements, on the opinion of Stecher, J., at Trial Term. Concur — Kupferman, J. P., Milonas and Alexander, JJ.

Carro and Asch, JJ., dissent in a memorandum by Asch, J., as follows: The 89-year-old plaintiff, Linda Martorano, also known as Valeria Martorano, now deceased, was the defendant's aunt. On July 25, 1979, plaintiff conveyed two parcels of real property to her niece, defendant Linda Brizzolara. In this action plaintiff sought to have a constructive trust imposed on the real property, to have such property reconveyed to her by the defendant, and to have defendant account for various moneys collected by her. Plaintiff's husband died in 1975. She was childless and after the death of her husband, lived alone in the building owned by her at 323 West 19th Street, Manhattan. A tenant in the building, John Slagle, had charge of the keys to plaintiff's safety deposit box. His wife, Joan, did plaintiff's bookkeeping, including the preparation of checks for expenses which plaintiff would sign. Plaintiff's will had been prepared in 1976 by attorney Cantania. In this will both Slagle and Cantania were named as beneficiaries. On April 6, 1979, plaintiff was examined by Dr. Ruggiero at

the defendant's request. He diagnosed plaintiff as having myocardial insufficiency, arteriosacleratic heart disease and high blood pressure. On or about April 9, 1979, plaintiff took an overdose of a sedative. She was found by neighbors who then notified defendant, as the nearest living relative. Defendant accompanied plaintiff, who was comatose, to St. Vincent's Hospital. She was confined to the hospital for about three and one-half weeks. Then she apparently requested defendant, her niece, to move into her apartment. Defendant moved in. While hospitalized, plaintiff was visited by Mrs. Slagle who had plaintiff sign certain checks. Mrs. Slagle stated that she found plaintiff to be mentally alert. Shortly thereafter, defendant asked Mrs. Slagle to return plaintiff's checkbook, which Mrs. Slagle did. Plaintiff was discharged from the hospital on May 4, 1979. Nursing service for plaintiff was arranged by defendant. On May 11, 1979, Mr. Slagle was prevented from seeing plaintiff by defendant, who referred him to a lawyer, Mr. Segal. Slagle saw Segal who informed the former that Slagle's control of plaintiff's safety deposit box, as well as the fact that Slagle and Cantania were mentioned in the plaintiff's will, prepared by Cantania, raised a question of impropriety. On May 7, 1979, lawyer Cantania visited plaintiff and defendant, at defendant's request. He was informed that plaintiff desired to have a new will prepared, naming defendant as sole beneficiary. Cantania initially refused to prepare such will on the ground that plaintiff was incompetent to make a will. However, on insistence by plaintiff and defendant that this is what plaintiff wanted, he acquiesced and prepared the will which plaintiff then executed. He did this because, according to his testimony defendant otherwise threatened to leave plaintiff. Again, it must be remembered, that Cantania, a beneficiary under the prior will, had a personal interest in plaintiff not changing the testamentary disposition of her property. At the same time (May 7), defendant also obtained return of the safe deposit box key from Slagle. According to defendant she did this because her elderly aunt did not know the whereabouts of her jewelry. On May 13, 1979, plaintiff was readmitted to St. Vincent's suffering from acute urinary retention. She remained in the hospital until May 23, 1979. Defendant visited plaintiff frequently at the hospital. In the latter part of May, 1979, attorney Segal who formerly had been engaged in the practice of optometry and as such, had examined plaintiff and her husband and knew them for many years, was contacted by defendant with respect to problems she was having with certain tenants at her aunt's property on West 19th Street. Concern over the plaintiff's ability to take care of the property prompted the suggestion that if defendant had a power of attorney she could manage the property. Segal and his partner, Erlitz, also an attorney, went to plaintiff's apartment where she executed a power of attorney for both her properties. They testified that plaintiff appeared to be mentally capable. On May 29, 1979, Dr. Ruggiero again examined plaintiff, in her apartment. She appeared to be well oriented to her surroundings and fully responsive. He examined plaintiff again on June 2, 1979 and he found that her mental condition was good and had not deteriorated. From June 18 to June 27, 1979, plaintiff was in the hospital. She was visited by Slagle and another tenant, Morrissey. They found her to be mentally alert. Mr. Morrissey, who did odd jobs for plaintiff from time to time, was prevented by defendant in May, 1979, from visiting plaintiff. Defendant justified this action on the grounds that Morrissey was susceptible to alcohol. In July, 1979, defendant advised attorney Segal that her aunt wished to convey the two parcels of real property to her. Segal prepared the deeds and accompanied by his partner Erlitz, visited plaintiff at her apartment on July 25, 1979. Segal fully explained the meaning of the documents to plaintiff. She responded affirmatively and executed the deeds. Both attorneys

testified that in their opinion, plaintiff knew what she was doing. In October, 1979, after initially objecting to her aunt's wish to visit the home of Mr. and Mrs. Grasso, friends living in Queens, defendant called Mrs. Grasso and gave her approval. Plaintiff remained at the Grasso home for four days and then returned home. Shortly thereafter, according to the testimony of Mrs. Grasso, defendant stated to her: "Don't bother us here anymore at this house." Michael Mazzei, 85 years old, was a friend of plaintiff. He visited her regularly and continued these visits even after defendant moved in with plaintiff. On the occasions he visited plaintiff from April to November, 1979, he found her to be responsive and mentally alert. He stated that defendant took good care of her aunt, but noticed some change in plaintiff's attitude subsequent to her return in October, 1979 from her visit to the Grasso home. Dr. Ruggiero examined plaintiff for the fourth time on November 15, 1979 at her apartment. He saw nothing which led him to conclude that plaintiff was not in control of her faculties. On Thanksgiving Day, 1979, Michael Mazzei was the guest of plaintiff and her niece. All seemed normal and the plaintiff had been talking with him. Defendant asked him to come to the kitchen to get food. When he returned plaintiff was gone. They found her at the police station. Plaintiff evinced a belief that defendant was trying to kill her. The police took plaintiff to Bellevue for observation for three or four days. Upon her discharge, plaintiff went to live with Mr. and Mrs. Grasso and subsequently she commenced the instant action. The trial court found in plaintiff's favor, imposed a constructive trust on the two parcels of real property. It directed defendant to reconvey said parcels to plaintiff and to account for income received since April 10, 1979, from the realty. The trial court found "[t]hat Mrs. Martorano (plaintiff) was old and feeble * * * that her niece, a forceful, demanding woman, cut Mrs. Martorano off from her friends and neighbors. The inference is unassailable that Mrs. Brizzolara unduly influenced the conveyance to the defendant of these two parcels of real property." The record does not support the trial court's finding that defendant cut her aunt off from her friends and neighbors. At all critical and relevant times both Mr. and Mrs. Grasso and Michael Mazzei were permitted to see plaintiff. Only contact with Mr. and Mrs. Slagle and Morrissey was cut off and this was done under circumstances permitting two equally reasonable inferences, to wit, that defendant, as a dutiful niece, was seeking to protect her aunt from the overreaching of the Slagles and the unsavory influence of Morrissey, or that defendant was seeking to advance her own self-interests and overreaching. However, the former inference, that the defendant was seeking to protect her aunt, is supported by the undisputed fact that defendant obtained both frequent nursing and medical care for her aunt throughout the period in question. The medical testimony in the record is extremely relevant. Dr. Williams, an intern at the time of the plaintiff's admission to St. Vincent's in April, 1979, testified that plaintiff improved and became more alert and responsive in the days succeeding her admission to St. Vincent's on April 10, 1979. However, on the sixth day she was disoriented and apparently hallucinating. Plaintiff was diagnosed as suffering from acute organic mental syndrome — a deterioration of intellectual abilities, memory (particularly recent) and comprehension. By acute, as compared with chronic, the condition is described as limited, having a sudden onset and resolution. Dr. Williams opined that the condition could disappear overnight or might continue for a period of time. However, she subsequently stated that plaintiff's organic brain syndrome appeared to be chronic based on her examination of hospital records for plaintiff's first three 1979 hospitalizations at St. Vincent's. Her further qualification was that there really was not enough information in the admission record to make an informed determination of the extent (mild or

serious) of plaintiff's mental impairment. Dr. Williams, an intern specializing in internal medicine, was permitted to examine the psychiatric hospitalization records relating to plaintiff's stay at Bellevue Hospital and to give her medical opinion as to plaintiff's mental condition. No psychiatrist testified. Dr. Williams reiterated that though plaintiff suffered from organic brain syndrome, she could not testify as to plaintiff's condition with particularity for each day of the period from April, 1979 through November, 1979. There could be a remission but the impairment would not totally go away. Dr. Williams admitted that it was both possible and conceivable that a person suffering from organic brain syndrome could understand and comprehend the process and consequence of conveying property. She also admitted that no testing was done with respect to plaintiff's "immediate" memory (as compared to "recent" and "remote") until November, 1979, and that a prior Roosevelt Hospital admission diagnosed plaintiff's organic brain syndrome condition as mild. The trial court commented at the conclusion of plaintiff's testifying on her own behalf at trial that while "there are * * * many areas in this woman's memory and her thought processes that appear * * * to be impaired * * * there's no question that she knows that she's here in order to secure her own ownership of certain property and rights." Dr. Ruggiero, licensed in New York since 1943, testified that during his examination of plaintiff on April 6, 1979, plaintiff set forth her complaints in detail and her responses were appropriate. On this basis, the doctor concluded that plaintiff was capable of understanding everything that he said and of answering him. Upon his subsequent examination of plaintiff on May 29, 1979, plaintiff stated that she felt stronger and had less dizziness. She did not merely respond "yes" and "no" to the doctor's questions. A third examination was held on June 2, 1979, and again the conversation did not involve simple "yes" or "no" responses from plaintiff. Instead, plaintiff gave specific answers to the doctor's interrogatories. The final time Dr. Ruggiero examined plaintiff was on November 15, 1979. She responded that she felt "better, stronger". The doctor testified that on all four visits he "chit chatted" with plaintiff and that he felt her mental processes not to be impaired on these occasions. Dr. Ruggiero was familiar with the condition of organic mental syndrome and opined that plaintiff knew what she was doing. He declared that there were lucid periods when a person suffering from such condition would know what he or she was doing. He spoke to plaintiff "in Italian and English and plaintiff similarly conversed both in Italian and English" during his visits. The record does not support the trial court's finding that "nowhere in [Dr. Ruggiero's] testimony is there a suggestion that the conversation ever required much more than a 'yes' or 'no' answer". Nevertheless, from this finding, based on an unjustified inference, the trial court denigrated Dr. Ruggiero's medical testimony as to plaintiff's mental capacity to transfer title to her realty. The trial court never reached the issue of whether plaintiff knew what she was doing in conveying her property, but predicated its conclusion on duress exerted by the niece demonstrated by the niece's cutting plaintiff off from her friends and neighbors. As noted, this finding is not supported by the record. On the issue of whether plaintiff lacked the requisite mental capacity to convey the real property to her niece, it is significant that she did not bring in any of the psychiatrists who examined her and merely submitted a report which was not subject to cross-examination. Further, plaintiff's expert, Dr. Sara Williams, was not qualified as a psychiatrist. The testimony of defendant's witnesses, attorneys Segal and Erlitz, that plaintiff understood what she was doing when she executed the deeds was not contradicted. Indeed, plaintiff presented no unequivocal proof as to her mental condition on July 25, 1979. The law is clear that in order to set aside a contract or transfer property

on the grounds of lack of mental capacity, it is essential to establish that the party did not understand the nature of the transaction at the time of the conveyance as a result of her mental disability. (*Jackson ex dem. Cadwell v King,* 4 Cow 207; *Christensen v Larson,* 77 NW2d 441 [ND].) Quite properly on the facts before it, the trial court did not find that the plaintiff lacked legal capacity to transfer the property to her niece. Instead, it held that the transfers were made as a result of undue influence or duress. Whether the aged plaintiff was motivated by affection or family feeling, whether she was influenced by gratitude for past services or the desire to insure continued care, no one knows. However, transfers under the circumstances before us take place each day and they do not justify a finding of undue influence. The ghost of Cardozo, like that of Banquo, hovers suggestively in every case of alleged overreaching. However, to impress a constructive trust, more is required than simply the invocation of the words of Cardozo. Sympathy is not enough to set aside a conveyance. An ordered legal system has a stake in upholding valid conveyances and a factual showing of undue influence must be affirmatively established before a court may impress a constructive trust or set aside a conveyance. (*Sharp v Kosmalski,* 40 NY2d 119, 123; *Simonds v Simonds,* 45 NY2d 233, 241-242.) There was no showing in the record that defendant practiced a fraud upon or made any misrepresentations, either intentional or innocent, to plaintiff. (See *Benanti v Benanti,* 45 NY2d 993.) "Plaintiff has the burden of proving his case by a fair preponderance of the credible evidence. If, at the close of the proofs, the evidence as a matter of logical necessity is equally balanced, plaintiff has failed to meet his burden and the cause of action is not made out (e.g., *Ford v McAdoo,* 231 NY 155, 160-161; *Matter of Erin Wine & Liq. Store v O'Connell,* 283 App Div 443, 446 affd 307 NY 768, and cases cited; cf. *Roberge v Bonner,* 185 NY 265, 269; Richardson, Evidence [10th ed], § 97, p 74)" (*Rinaldi & Sons v Wells Fargo Alarm Serv.,* 39 NY2d 191, 196). Upon the record herein, plaintiff failed to meet her burden and thus failed to make out a cause of action for a constructive trust. The proof did not establish that defendant held this property under such circumstances that in equity and good conscience she should not retain it (*Miller v Schloss,* 218 NY 400, 407; *Sharp v Kosmalski, supra; Simonds v Simonds, supra;* see, also, 61 NY Jur, Trusts, § 140). This court is not bound by the trial court's interpretation of the evidence. (See *Cohen v Hallmark Cards,* 45 NY2d 493, 497; 7 Weinstein-Korn-Miller, NY Civ Prac, pars 5522.04, 5522.05.) Accordingly, the judgment of the Supreme Court, New York County (Stecher, J.), entered October 21, 1981, after a nonjury trial, which imposed a constructive trust on two parcels for the benefit of plaintiff and ordered defendant to account for income for the realty received since April 10, 1979, should be reversed, on the law and the facts, without costs, and judgment entered in favor of defendant dismissing the complaint.