## SKIDMORE v. BALTIMORE & O. R. CO.
### No. 168, Docket 20862.

Circuit Court of Appeals, Second Circuit.
March 15, 1948.

Blank and Convisser, of Brooklyn, N. Y., and Morris S. Borden, of Cleveland, Ohio (William Samuels, of New York City, of counsel), for plaintiff-appellee.

Robert Schwebel, of New York City, and James E. Jones, of White Plains, N. Y. (William C. Combs, of Rochester, N. Y., of counsel), for defendant-appellant.

Before L. HAND, SWAN, and FRANK, Circuit Judges.

FRANK, Circuit Judge.

■ 1. The judge properly denied the motion for a directed verdict or a new trial. The evidence was sufficient to justify the jury in concluding (a) that defendant directed plaintiff to work in the manner and at the place in which he worked, and (b) that defendant was negligent, in requiring plaintiff to perform such services when defendant had not cleared the snow and ice under the car. Since the judge properly charged with respect to a deduction for contributory negligence, pursuant to the Act, we must assume that the jury made such a deduction. On the record before us, we cannot

say that, after a reasonable deduction, a verdict of $30,000 was excessive (assuming that we have the power to consider that question).

■ 2. Defendant argues that the judge erred in denying its request for a special verdict. We cannot agree.

Undeniably, the verdict affords no satisfactory information about the jury's findings. But almost every general verdict sheds similar or even greater darkness. Such verdicts account for much (not all) of the criticism of the civil jury. Some revaluation of the jury system seems not unjustified in the light of the fact that ours is the only country in the world where it is still highly prized. Lauded as essential to individual liberty and democracy, and imported in the late eighteenth and nineteenth centuries from England and the United States, trial by jury was adopted in criminal cases on the European continent,[1] but subsequently ceased there, in pre-Hitler days, to maintain its popularity.[2] Nor can that attitude be explained as a symptom of decreased interest in democracy and individualism. For Scotland, surely long a land of liberty-loving individualists, having in the sixteenth century virtually rejected the civil jury,[3] re-adopted it in 1815, and, still later, all but gave it up. In England, whence trial by jury came to us, it is now seldom employed in civil suits, has been abandoned in criminal prosecutions other than for major crimes, and even there is used decreasingly.[4] In the United States, the number of jury-waivers indicates the jury's slowly waning popularity.[5] But here, especially in the federal courts, the civil jury, in many

---

[1] The Swedish civil jury (or Nämnd) has a much older history; it appears to have been of ancient indigenous growth. See Engelman, History of Continental Civil Procedure (Millar ed. 1927) 212, 213, 216, 217, 225-232, 836-869. As to similar ancient institutions in other Scandinavian countries, see Forsyth, History of Trial By Jury (1875) Chapter 2; Moschzisker, Trial By Jury (1930) 13-19.

[2] Seagle, Jury, 8 Encyc. of Social Sciences (1932) 498, 499-599; Pound, ibid, 492, 496, 497.

[3] An historical accident, the marriage of James V of Scotland to a French princess, seems to have led to Scotland's reception of Roman law and thus to its sixteenth-century abandonment of the civil jury (except in the local courts).

[4] See citations in note 2. See, also, Orfield, Criminal Procedure From Arrest to Appeal (1947) 361: "Perhaps the most important development in the administration of justice in England during the last half century has been the obsolescence of the petit jury through the enlargement of the powers of the courts of summary jurisdiction to hear and determine indictable offenses. Howard, Criminal Justice in England (1931) 319. In England, in 1926, 69,695 defendants charged with indictable offenses were dealt with in courts of summary jurisdiction and only 7,924 were committed for jury trial at the higher courts. Howard, loc. cit., 407."

Paton, Jurisprudence (1946) 459, says that "in 1935 only one-eighth of the indictable cases were tried by jury," and that "in civil cases in the King's Bench Division the proportion of jury cases is only slightly higher, while in the County Court it sank to 0.006 per cent."

[5] The percentage of American cases in which juries are waived seems on the increase. Nevertheless, the number of jury trials is not negligible. See the following excerpt from the Annual Report of the Administrative Office of the United States Courts for 1947, as to trials in the federal district courts: "The figures for trials begun in the 84 districts for the past four years are given in the following tabulation:

| | Total Trials | Total Civil | Civil Court | Civil Jury | Total Criminal | Criminal Court | Criminal Jury |
|---|---|---|---|---|---|---|---|
| 1944 | 9,951 | 5,025 | 2,702 | 2,323 | 4,926 | 1,819 | 3,107 |
| 1945 | 8,390 | 4,358 | 2,845 | 1,513 | 4,032 | 1,391 | 2,641 |
| 1946 | 7,756 | 4,586 | 3,153 | 1,433 | 3,170 | 1,139 | 2,031 |
| 1947 | 7,471 | 5,042 | 3,408 | 1,634 | 2,429 | 988 | 1,441 |

These figures were supplied by the district court clerks, who reported as trials all contested proceedings, not including motions, before either a court or a jury in which evidence was introduced and final judgment sought. They do not include hearings based on agreed statement of facts, disposition of cases on motion such as for summary judgment, disposition on findings of masters or judgments entered as a result of pretrial conferences."

cases, cannot be eliminated except by constitutional amendments. We must, then, as to some kind of cases,[6] assume that it will long be with us.

But what many persons regard as its major defects can be mitigated. One device which will help to achieve that end is the special or fact verdict. Those who resent any reform which invades the jury's province should be reassured by the historians who teach that the special verdict is no new-fangled idea, but one almost as old as the jury itself, older indeed than the modern jury. In those early days, Morgan tells us, jurors often successfully insisted upon the right to render such verdicts against the desires of the judges who wanted general verdicts.[7] To be sure, in this country, during the latter part of the eighteenth and the early part of the nineteenth centuries, the right to return a general verdict was highly esteemed as the jury's prerogative, especially in criminal cases; the judges then instructed the juries that they were to decide both "the law" and the facts, not being bound by the opinion of the trial judge.[8] Most jurisdictions later repudiated that doctrine.[9] The courts and legal writers declared that,

if juries had the right to ignore the judges' instructions as to the applicable legal rules, the "law" would "become as variable as the prejudices, the inclinations and the passions of men"; "the parties would suffer from an arbitrary decision"; "decisions would depend entirely upon juries uncontrolled by any settled, fixed, legal principle," and would be "according to what the jury in their own opinion suppose the law is or ought to be"; our government" would "cease to be a government of laws and become a government of men"; "jurors would become not only judges but legislators as well"; the "law" would "be as fluctuating and uncertain as the diverse opinions of different juries in regard to it"; jurors would be "superior to the national legislature, and its laws * * * subject to their control" so that a "law of Congress" would "be in operation in one state and not in another."[10]

Yet no amount of brave talk can do away with the fact that, when a jury returns an ordinary general verdict, it usually has the power utterly to ignore what the judge instructs it concerning the substantive legal rules, a power which, because generally it cannot be controlled,[11] is in-

---

[6] Of course, in a very considerable number of cases, no right to trial by jury exists because of historically determined fortuities. Thus in a suit on a note, the right exists, but not in a suit to cancel the note; the same difference maintains between a suit for breach of contract for the sale of land and one for specific performance thereof. So, too, the right to a jury vanishes if, before suit is brought, the defendant goes into bankruptcy. Were jury trial as beneficent as its ardent devotees proclaim, such differences would be indefensibly irrational.

[7] Morgan, A Brief History of Special Verdicts and Special Interrogatories, 32 Yale L.J. (1923) 575, 588.

[8] Howe, Juries as Judges of Criminal Law, 52 Harv.L.Rev. (1939) 582; see also the lengthy dissenting opinion of Gray, J. (in which Shiras, J., concurred) in Sparf and Hansen v. United States, 156 U.S. 51, 110-183, 15 S.Ct. 273, 39 L.Ed. 343.

That, for a time, such was the practice even in civil cases, see, e.g., the charge of Chief Justice Jay in State of Georgia v. Brailsford, 1794, 3 Dall. 1, 4, 1 L.Ed. 483. Cf. Thayer, A Preliminary Treatise on Evidence (1898) 254 note 2.

[9] See Howe, loc. cit. The decisive opinion as to current federal practice is, of course, Sparf and Hansen v. United States, 1895, 156 U.S. 51, 15 S.Ct. 273, 39 L.Ed. 343.

[10] Most of these statements are quoted in the majority opinion in Sparf and Hansen v. United States, supra. See also Frank, Law and The Modern Mind (1930) 307, 308; Frank, If Men Were Angels (1942) 82-84; Chamberlayne, Evidence (1911) §§ 72, 74; Duffey v. People, 26 N.Y. 588, 591, 592; Hamilton v. People, 29 Mich. 173, 191; Pennsylvania v. Bell, Add., Pa., 156, 160, 1 Am.Dec. 298; 2 Thompson, Trials, 2d Ed., § 2134.

[11] Cf. Thayer, loc cit., 253, 254; Chamberlayne, loc. cit., 124.

The trial judge, of course, can grant a new trial in any civil case, and in a criminal case where the verdict is against the defendant. But he thus exercises merely a temporary veto, since another jury, with like power, again hears the case. Except in unusual circumstances, there is a limit to the number of new trials which may be granted. Louisville & Nashville R. Co. v. Woodson, 134 U.S. 614, 623, 10 S.Ct. 628, 33 L.Ed. 1032; Joyce v. Charleston Ice Manufacturing

distinguishable for all practical purposes, from a "right."[12] Practically, then, for all we may say about the jury's duty when it renders a verdict, we now do have the very conditions which we were warned would result if the jury had the right to decide legal propositions: cases are often decided "according to what the jury suppose the law is or ought to be"; the "law," when juries sit, is "as fluctuating and uncertain as the diverse opinion of different juries in regard to it"; and often jurors are "not only judges but legislatures as well." Indeed, some devotees of the jury system praise it precisely because, they say, juries, by means of general verdicts, can and often do nullify those substantive legal rules they dislike,[13] thus becoming ad hoc ephemeral

Co., C.C., 50 F. 371, 375; Clark v. Barney Dumping Co., C.C., 109 F. 235; Milliken v. Ross, C.C., 9 F. 855; 46 C.J. 70, 71.

12 See Frank, If Men Were Angels (1942) 83, 84; Kane v. Commonwealth, 89 Pa. 522, 525, 33 Am.Rep. 787; cf. Frank, Words and Music: Some Remarks On Statutory Interpretation, 47 Col.L.Rev. (1947) 1259, 1264-1278.

13 See, e. g., Wigmore, A Program For the Trial of a Jury Trial, 12 Am.Jud. Soc. (1929) 166: "Law and Justice are from time to time inevitably in conflict. That is because law is a general rule (even the stated exceptions to the rules are general exceptions); while justice is the fairness of this precise case under all its circumstances. And as a rule of law only takes account of broadly typical conditions, and is aimed at average results, law and justice every so often do not coincide. Everybody knows this, and can supply instances. But the trouble is that Law cannot concede it. Law— the rule—must be enforced—the exact terms of the rule, justice or no justice. 'All Persons Are Equal before the Law'; this solemn injunction, in large letters, is painted on the wall over the judge's bench in every Italian court. So that the judge must apply the law as he finds it alike for all. And not even the general exceptions that the law itself may concede will enable the judge to get down to the justice of the particular case, in extreme instances. The whole basis of our general confidence in the judge rests on our experience that we can rely on him for the law as it is. But, this being so, the repeated instances of hardship and injustice that are bound to occur in the judge's rulings will in the long run injure that same public confidence in justice, and bring odium on the law. We want justice, and we think we are going to get it through 'the law,' and when we do not, we blame 'the law.' Now this is where the jury comes in. The jury, in the privacy of its retirement, adjusts the general rule of law to the justice of the particular case. Thus the odium of inflexible rules of law is avoided, and popular satisfaction is preserved. * * * That is what jury trial does. It supplies that flexibility of legal rules which is essential to justice and popular contentment. And that flexibility could never be given by judge trial. The judge (as in a chancery case) must write out his opinion, declaring the law and the findings of fact. He cannot in this public record deviate one jot from those requirements. The jury, and the secrecy of the jury room, are the indispensable elements in popular justice."

See Pound, Law In Books and Law In Action, 44 Am.L.Rev. (1910) 12, 18, 19: "Jury lawlessness is the great corrective law in its actual administration. The will of the state at large imposed on a reluctant community, the will of a majority imposed on a vigorous and determined minority, find the same obstacle in the local jury that formerly confronted kings and ministers. * * * What is the purpose and what the occasion of the extensions of the powers of juries to which I have referred? Practically the purpose is, in largest part, to keep the letter of the law the same in the books, while allowing the jury free rein to apply different rules or extra-legal considerations in the actual decision of causes—to create new breaches and widen existing breaches between law in the books and law in action. The occasion is that popular thought and popular action are at variance with many of the doctrines and rules in the books, and that the law is trying to save the latter and accommodate itself to the former. * * * If the ritual of charging the jury on the law with academic exactness is preserved, the record will show that the case was decided according to law, and the fact that the jury dealt with it according to extra-legal notions of conformity to the views of the community for the time being, is covered up."

Mr. Justice Chalmers stated this position thus: "Again there is an old saying that hard cases make bad law. So they do when there is no jury. The Judge is anxious to do justice to the particular parties before him. To meet

(un-elected) legislatures [14] (a state of affairs singularly neglected by most writers on jurisprudence,[14a] who would do well to modify their ideas by recognizing what might be called "juriesprudence"). Surprisingly, that sort of defense of the general verdict is not seldom voiced by lawyers who, in the next breath, demand strict adherence to the legal precedents.[14b]

"Competent observers," writes Judge

---

a particular hard case he is tempted to qualify or engraft an exception upon a sound general principle. When a judge once leaves the straight and narrow path of law, and wanders into the wide fields of substantial justice, he is soon irretrievably lost. * * * But hard cases tried with a jury do not make bad law, for they make no law at all, as far as the findings of the jury are concerned. The principle is kept intact while the jury do justice in the particular case by not applying it." See Frank, Law and the Modern Mind (1930) 174: "By such use of the jury, you can eat your cake and have it too. You can preserve your rules and principles unswerving and unyielding —in the form of the judge's instructions —and you can have a jury's decision (which determines the rights of the parties to the case) that is based upon scant respect for those abstractions as against emotional appeals. The rules and principles remain pure and unsullied—because, while clearly enunciated, they are not applied. * * * 'It cannot be doubted,' says Chamberlayne, 'that a principal claim of the jury to popular favor is its traditional ability to defy, in a general verdict, the law of the land as announced by the judge.'" See Chamberlayne, Evidence (1911) § 73; Thompson, Trials, 2d Ed., § 2133.

[14] See Frank, Words and Music: Some Remarks on Statutory Interpretation, 47 Col.L.Rev. (1947) 1259, 1274-1276; Frank, If Men Were Angels (1942) 87, 88.

In support of this defense of the general verdict, an oft-cited illustration is the refusal of many juries to apply the harsh fellow-servant rule. But it is not unlikely that the judges themselves failed to abolish that judge-made rule precisely because jury verdicts made it seem unnecessary to do so. And, since some juries doubtless did apply that rule, the result was an unfair lack of uniformity in the decisions. Aside from its episodic and capricious character, such "law making" by juries seems an unnecessarily clumsy method of nullifying undesirable precedents. The same can be said of the argument that general verdicts provide desirable individualization of cases which some legal rules, were they applied, would prevent.

It is notable that, in cases where, for historical reasons, juries do not sit—as in equity and many admiralty suits—the judges have been less reluctant to contrive flexible rules and to revise undesirable precedents.

If any legal rules are too harsh or otherwise undesirable, and the judges are unwilling, or (where the rules are statutory) unable, to modify them, recourse should be had to the legislatures which today are less tardy in acting than once they were. It seems unwise to pretend to keep legal rules alive and leave their amendment or nullification to a series of legislatures, each consisting of twelve men or women, casually selected as jurors. It may be, moreover, that reliance on jury nullification of legal rules has retarded desirable remedial legislation by the elected legislatures.

More important, the theory that juries legislate undesirable substantive rules out of existence rests on the false assumption that the jurors, with full understanding of the rules announced in the judge's charge, deliberately and consciously nullify them. In truth, the jurors often have no understanding of that part of the judge's charge but (frequently on the basis of prejudice) simply bring in a general verdict for the party they favor. The jurors' legislation is thus often blind and unintentional. See infra, footnote 25a.

[14a] See, e. g., the following: Cardozo, The Nature of The Judicial Process (1921); Cardozo, The Growth of the Law (1924); Friedman, Legal Theory (1944); Patterson, An Introduction To Jurisprudence (1946); F. S. Cohen, Transcendental Nonsense and The Functional Approach, 35 Col.L.Rev. (1935) 809.

Indeed these, and many other such treatises, read as if the trial courts were virtually non-existent.

[14b] See Frank, Law and The Modern Mind (1930) 174: "Jury-made law, as compared with judge-made law, is peculiar in form. It does not issue general pronouncements. You will not find it set forth in the law reports or in textbooks. It does not become embodied in a series of precedents. It is nowhere codified. For each jury makes its own law in each case with little or no knowledge of or reference to what has been done before or regard to what will be done thereafter in similar cases."

Rossman, "who have interviewed the jurors in scores of jury trials, declare that, in many cases where the general verdict was employed, principal issues received no consideration whatever from the jury.[14c] The general verdict, then, has some strange characteristics. As Sunderland puts it.[15] "The peculiarity of the general verdict is the merger into a single indivisible residuum of all matters, however numerous, whether of law or fact. It is a compound made by the jury which is incapable of being broken up into its constituent parts. No judicial reagents exist for either a qualitative or a quantitive analysis. The law supplies the means for determining neither what facts were found, nor what principles of law were applied, nor how the application was made. There are therefore three unknown elements which enter into the general verdict; (a) the facts; (b) the law; (c) the application of the law to the facts. And it is clear that the verdict is liable to three sources of error, corresponding to these three elements. It is also clear that if error does occur in any of these matters it cannot be discovered, for the constituents of the compound cannot be ascertained. No one but the jurors can tell what was put into it and the jurors will not be heard to say. The general verdict is as inscrutable and essentially mysterious as the judgment which issued from the ancient oracle of Delphi. Both stand on the same foundation—a presumption of wisdom. The court protects the jury from all investigation and inquiry as fully as the temple authorities protected the priestess who spoke to the supplient votary at the shrine. It is quite probable that the law is wise in not permitting jurors to testify as to how they compounded their verdict, for all stability would disappear if such inquiries were open.[15a]

* * * As to the second element in the general verdict, the *law,* it is a matter upon which the jury is necessarily ignorant. The jurors are taken from the body of the county, and it is safe to say that the last man who would be called or allowed to sit would be a lawyer. They are second-hand dealers in law, and must get it from the judge. They can supply nothing themselves; they are a mere conduit pipe through which the court supplies the law that goes into the general verdict. But while the jury can contribute nothing of value so far as the law is concerned, it has infinite capacity for mischief, for twelve men can easily misunderstand more law in a minute than the judge can explain in an hour. Indeed, can anything be more fatuous than the expectation that the law which the judge so carefully, learnedly and laboriously expounds to the laymen in the jury box become operative in their minds in its true form? One who has never studied a science cannot understand or appreciate its intricacies, and the law is no exception to this rule. The very theory of the jury and its general verdict is thus predicated upon a premise which makes practically certain an imperfect or erroneous view of the principles of law which are to be compounded into the verdict. The instructions upon the law given by the court to the jury are an effort to give, in the space of a few minutes, a legal education to twelve laymen upon the branch of the law involved in the case. Law cannot be taught in any such way. As to this element, accordingly, the general verdict is almost necessarily a failure. As to the third element in the general verdict—*the application of the law to the* facts, we find the same difficuly as in the case of the first element—a merging of the law into the verdict in such a way

---

14c Rossman, The Judge-Jury Relationship in the State Courts, 3 F.R.D. 98, 108.

15 Sunderland, Verdicts, General and Special, 29 Yale L.J. (1920) 253.

15a See McDonald v. Pless, 238 U.S. 264, 35 S.Ct. 783, 59 L.Ed. 1300; Fabris v. General Food Corp., 2 Cir., 152 F.2d 660; but cf. United States v. Pleva, 2 Cir., 66 F.2d 529, 533.

In some states, however, such inquiries are permitted, sometimes pursuant to statute; see 2 Thompson, Trials (2d Ed.) § 2677. Where such inquiries are permitted, strange happenings are not seldom disclosed, such as, e. g., that the jury reached its verdict by drawing lots or other gambling method (a la Rabelias' Bridlegoose). Cf. Goins v. State, 46 Ohio St. 457, 21 N.E. 476, 482; 2 Thompson, Trials, 2d Ed., §§ 2601, 2602.

that it is impossible to tell how or whether the jury applied the law. They may have applied it in a wholly wrong way, or they may have failed to apply it at all. No analysis of the verdict can be made which will throw any light on the process. Since the case can ordinarily go to the jury only if a verdict either way is legally possible, whatever the jury does is presumed to be right, and this presumption excludes any inquiry from the jurors themselves. Cases may arise where the verdict shows on its face a failure to properly apply the law, usually as relating to the measure of damages, but in the vast majority of cases the verdict is a complete mystery, throwing a mantle of impenetrable darkness over the operations of the jury. Whether the jurors deliberately and openly threw the law into the discard, and rendered a verdict out of their own heads, or whether they applied the law correctly as instructed by the court, or whether they tried to apply it properly but failed for lack of understanding,—these are questions respecting which the verdict discloses nothing. So far, therefore, as the third element goes, the general verdict is an unknown and unknowable mystery, with the balance of probability against it. * * * We come, then, to this position, that the general verdict * * * confers on the jury a vast power to commit error and do mischief by loading it with technical burdens far beyond its ability to perform, by confusing it in aggregating instead of segregating the issues, and by shrouding in secrecy and mystery the actual results of

its deliberations. * * * The record must be absolutely flawless, but such a result is possible only by concealing, not by excluding mistakes. This is the great technical merit of the general verdict. It covers up all the shortcomings which frail human nature is unable to eliminate from the trial of a case. In the abysmal abstraction of the general verdict concrete details are swallowed up, and the eye of the law, searching anxiously for the realization of logical perfection, is satisfied. In short, the general verdict is valued for what it does, not for what it is. It serves as the great procedural opiate, * * * draws the curtain upon human errors and soothes us with the assurance that we have attained the unattainable.[15b]

The general verdict enhances, to the maximum, the power of appeals to the biases and prejudices of the jurors,[15c] and usually converts into a futile ritual the use of stock phrases about dispassionateness almost always included in judges' charges.[15d] Many books on trial tactics, written by experienced trial lawyers, which give advice as to how to arouse juries' emotions, make the point that a jury tries the lawyers rather than the case, and that the lawyers, in jury trials, must recognize themselves as actors or stage-managers engaged in theatrical performances.[16] In a series of pamphlets on trial practice, recently published under the auspices of the American Bar Association, one author writes that "the advocate * * * must always recognize that the jury is judging the lawyer as well as the witnesses, quick to take

[15b] See Clementson, Special Verdicts and Findings By Juries (1905) 12: "Nor can we cut away the mantle of mystery in which the general verdict is enveloped, to see how the principal facts were determined, and whether the law was applied under the judge's instructions. * * * It is a matter of common knowledge that the general verdict may be the result of anything but the calm deliberation, the weighing of evidence, exchange of impressions and opinions, resolution of doubts, and final intelligent concurrence which, theoretically, produced it. It comes into court unexplained and impenetrable."

[15c] See, e. g., Chamberlayne, loc. cit., §§ 95, 300, 301, 302, 311.

[15d] See, e. g., the charge reported in 3 F. R. D. 118, 119: "The law will not permit jurors to be governed by mere sentiment, conjecture, sympathy, passion or prejudice, public opinion or public feeling * * * and you will reach a verdict that will be just to both sides, regardless of what the consequences may be." Another typical statement runs thus: "You are to sit here absolutely free from any bias or prejudice or sympathy or any like emotion, and judicially determine what the facts are."

[16] See, e. g., Goldstein, Trial Technique (1935); Harris, Hints On Advocacy (1943 ed.); Longenecker, Hints On The Trial of A Law Suit (1927).

sides because of the protagonists rather than their opinion of the testimony"[17] another says that the jurors' reaction to trial counsel "may be more important than the reaction to the client, for the client appears on the stand only during a relatively brief period, while the lawyer is before the jury all the time"; this same author gives detailed suggestions of means by which a lawyer may "ingratiate himself" with the jury.[18] A court has solemnly decided that "tears have always been considered legitimate arguments before a jury," that such use of tears is "one of the natural rights of counsel which no court or constitution could take away," and that "indeed, if counsel has them at command, it may be seriously questioned whether it is not his professional duty to shed them whenever proper occasion arises. * * *"[19] Harris, in his well known book on advocacy, says, "It may be that judgment is more easily deceived when the passions are aroused, but if so, you [the lawyers] are not responsible. Human nature was, I presume, intended to be what it is, and when it gets into the jury-box, it is the duty of the advocate to make the best use of it he fairly can in the interests of his client."[19a] This is no laughing matter. For prejudice has been called the thirteenth juror,[19b] and it has been noted that "Mr. Prejudice and Miss Sympathy are the names of witnesses whose testimony is never recorded, but must nevertheless be reckoned with in trials by jury."[19c]

Small wonder that Thayer commented that jury trials are "a potent cause of demoralization to the bar,"[20] or that Morgan, well versed in trial tactics, in reviewing a book on jury trial techniques, recently wrote:[21] "If only some lawyer could rise up and honestly denounce Mr. Goldstein as a defamer of his profession. * * * If only a reviewer could assert that this book is a guide not to the palaces of virtue but to the red-light districts of the law. But a decent respect for the truth compels the admission that Mr. Goldstein has told his story truly. He has told

---

[17] Gair, The Trial of a Negligence Action (1946) 36.

[18] Bodin, Selecting a Jury (1945) 50ff. See also, in the same series, Hays, Tactics in Cross-Examination (1946) 18ff. Cf. Bodin, Pleading and Practice (1946) 50-51.

[19] Ferguson v. Moore, 98 Tenn. 342, 39 S.W. 341, 343.

The court also said: "Perhaps no two counsel observe the same rules in presenting their cases to the jury. Some deal wholly in logic,—argument without embellishments of any kind. Others use rhetoric, and occasional flights of fancy and imagination. Others employ only noise and gesticulation, relying upon their earnestness and vehemence instead of logic and rhetoric. Others appeal to the sympathies—it may be the passions and peculiarities—of the jurors. Others combine all these with variations and accomplishments of different kinds."

[19a] Harris, Hints On Advocacy, 1943 Ed., 275.

Aristotle, in his Rhetoric, gave similar advice, in great detail, as to how to win cases before Greek juries. Those juries, we are told, "judged both the law and the facts"; but, in truth, so, too, do ours when they render general verdicts.

[19b] Osborn, The Mind of the Juror (1937) 92.

[19c] Osborn, The Problem of Proof (2d Ed. 1926) 112.

[20] Thayer, A Preliminary Treatise on Evidence (1898) 535. See also Osborn, The Mind of the Juror (Students' ed. 1937) 97, 190, 191.

See Boston, Some Practical Remedies For Existing Deficiencies in the Administration of Justice, 61 Un. of Pa.L.Rev. (1912) 1: "I never pick up a book on advocacy, or the so-called art of the advocate, that I am not horrified at the frankly unethical attitude of the writers toward the jury. One would think that trickery, chicanery and artful craftiness are the only elements that appeal to a jury. Courts are the institutions installed, presumably to give correct judgments upon ascertained states of fact, in dispute, under the application of the established law. But when one takes up treatises on advocacy, he sees that he, a practitioner at law, must or must not resort to this petty trick of art, or fall into this or that trap, for fear of its effect on the jury. He must refrain from asking certain questions, or practice certain ways with witnesses, to capture or keep the favor of the jury. The jury is the great bug-a-boo, whose childish impressionability must always be reckoned with in the administration of justice by its aid. One never hears such suggestions in respect to a judge unless he is unfitted for his position."

[21] Morgan, Book Review, 49 Harv.L. Rev. (1936) 1387, 1389.

it calmly, without a pretense of shame and [God save us!] without the slightest suspicion of its shamefulness. He has shown by his own unperturbed frankness with what compliance the profession, which would smile the superior smile of derision at the suggestion of a trial by battle of bodies, accepts trial by battle of wits. In all innocence, he has produced a volume which is a devastating commentary upon an important aspect of our administration of justice." Not that lawyers, trying to protect their clients, should be censured for employing the strategems described in such a book—as long as we retain the general-verdict jury system. But, with the general verdict in operation, and those strategems as its usual concomitants, it should not be surprising that one of the members of this court said, "I am by no means enamored of jury trials, at least in civil cases * * *[22]", and that Mr. Justice Cardozo, speaking for the Supreme Court, remarked, "Few would be so narrow or provincial as to maintain that a fair and enlightened system of justice would be impossible without" trial by jury.[22a]

That is not to say that, by way of contrast with juries, all trial judges are free of all susceptibility to emotional appeals, or that—although most trial judges, because of experience, are more skilled in fact-finding than juries and better armored against the seductive wiles of lawyers [22b]— any trial judge can (or should) slough off all predilections.[23] (Lord Bramwell observed, "One third of a judge is a common law juror if you get beneath his ermine"; and Mr. Justice Riddell added that "the other two thirds may not be far different." [23a]) Nor is it to say that, where con-

---

[22] L. Hand, The Deficiencies of Trials to Reach The Heart of The Matter, 3 Lectures on Legal Topics (1926) 89. Judge Hand has often elsewhere recognized important policy reasons for retaining the criminal jury.

[22a] Palko v. Connecticut, 302 U.S. 319, 325, 58 S.Ct. 149, 152, 82 L.Ed. 288. See also Adams v. United States ex rel. McCann, 317 U.S. 269, 279, 63 S.Ct. 236, 87 L.Ed. 268, 143 A.L.R. 435.

[22b] Cf. Chamberlayne, §§ 300, 306. And see footnote 23a, infra.

[23] See In re J. P. Linahan, Inc., 2 Cir., 138 F.2d 650, 651-654; Frank, A Plea For Lawyer-Schools, 56 Yale L. J. (1947) 1303, 1308; Frank, A Sketch of An Influence, in Interpretations of Modern Legal Philosophies (1947) 189, 235. And see footnote 37a, infra, as to the emotional element in a trial judge's reactions to the orally-testifying witnesses.

[23a] Riddell, Common Law and Common Sense, 27 Yale L.J. (1918) 993, 996. In Huskie v. Griffin, 75 N.H. 345, 74 A. 595, 598, 27 L.R.A.,N.S., 966, 139 Am.St. Rep. 718, the court said: "Judges are men, and their decisions upon complex facts must vary as those of jurors might on the same facts. Calling one determination an opinion and the others a verdict does not * * * make that uniform and certain which from its nature must remain variable and uncertain."

Nevertheless, the trial judge has distinct advantages. So far as he is a juror, his experience with many trials gives him a training for his job: the distractions and interruptions do not confuse him as they are likely to confuse the ordinary juryman. And obviously, the trial judge is far better able to understand the legal rules and the method of applying them to the facts.

Moreover, the character of a trial is different when only a trial judge sits. Says Green, "If the jury is taken out of the courthouse, the drama is gone. The court-room is not the same place. There is no tenseness. The lawyers are not the same; they no longer glare at one another. Even the parties are docile. The judge returns to himself. The attendants drop back into their humdrum ways. The crowd is made up of a few parties at interest and the habitual loungers. The place is dead. There is no haranguing in choosing the arbiter, nothing more than a brief statement of the issues, and seldom that; the examination of the witnesses proceeds with calmness, barring the most exceptional case; objections to evidence are seldom made, and when made, if there is the slightest uncertainty, the judge hears the evidence and states that if it appears to be inadmissible he will ignore it in his findings. The argument on the issues is brief and pointed. There are no instructions to prepare, no verdict, no motion for a new trial except in the rarest instance. The judge either announces his conclusion, or else takes it under advisement for further study and later announcement. He may then file the findings which support his decision. The whole process is deflated until there is little left to do save get down to business. The trial of the

stitutional or statutory provisions require jury trials, judges do not have the highest obligation to see that such trials are conducted in accordance with the basic principles which govern such proceedings.[24] But, as reasonable modifications of the jury system are not thereby precluded,[25] a vigorous revival of a traditional adjunct of that system, i.e., the special verdict, represents no deviation from judicial obligations.

Perhaps the least desirable feature of the general verdict, a feature which the fact verdict wipes out, is this: The theory of the general verdict involves the assumption that the jury fully comprehends the judge's instructions concerning the applicable substantive legal rules. [25a] Yet, often the judge must state those rules to the jury with such niceties that many lawyers do not comprehend them, and it is impossible that the jury can. Judge Bok notes that "juries have the disadvantage * * * of being treated like children while the testimony is going on, but then being doused with a kettleful of law during the charge that would make a third-year law-student blanch." [25b] Nevertheless, the patently fictitious assumption that the jurors have more legal wisdom than third-year law-students requires the upper court to reverse when a trial judge fails to state

---

same case before a judge and before the same judge with a jury, with the same lawyers, reflects the most startling differences. * * *" Green, Judge and Jury, 403, 404.

[24] The writer of this opinion has expressed his own views on this subject in a dissenting opinion in United States v. Antonelli Fireworks Co., 2 Cir., 155 F.2d 631, 642, 665, as follows: "It has been suggested that a judge (like me) who shares the doubts about the wisdom of the jury system is inconsistent if he urges that the courts be vigilant in preserving the jury's function. I do not understand that criticism. It is the sworn duty of judges to enforce many statutes they may deem unwise. And so, when on the bench, our private views concerning the desirability of the jury system are 'as irrelevant as our attitudes towards bimetallism or the transmigration of souls.' Consequently, as long as jury trials are guaranteed by constitutional or statutory provisions, it is the obligation of every judge, no matter what he thinks of such trials, to see that they are fairly conducted and that the jury's province is not invaded. That does not mean that a judge may not freely express his skepticism about the system, may not seek to bring about constitutional and statutory changes which will avoid or reduce what he considers its unfortunate results as it now operates."

[25] Ex parte Peterson, 253 U.S. 300, 40 S.Ct. 543, 64 L.Ed. 919.

[25a] Note, for instance, the following statement in a charge to a jury: "It would be a violation of your duty to attempt to determine the law or to base your verdict upon any other view of the law than that given you by the court—a wrong for which the parties would have no remedy, because it is conclusively presumed by the court and all higher tri-

bunals that you have acted in accordance with these instructions as you have been sworn to do." 3 F.R.D. 118.

[25b] Bok, I, Too, Nicodemus (1946).

There are at least three theories of how the general-verdict-jury-system works: (1) According to a naive theory, the judge conclusively determines the pertinent substantive legal rules, and the jury confines itself to finding the facts. (2) A more sophisticated theory runs thus: The judge has one function and the jury two. The judge announces authoritatively the pertinent rules of law. The jury (a) ascertain the facts and (b) apply to these facts the rules of law laid down by the judge and (c) thus arrive at their general verdict. The judge, that is, supplies the major premise, consisting of the abstract rules of law; the jury determine the minor premise from the evidence, and then work out the syllogism to its logical conclusion in the verdict which they report to the judge. Some of those who accept this theory assert that juries often circumvent the legal rules by misfinding the facts; the facts, it is said, are "found in order to reach the result." [See, e. g., Pound, Introduction to the Philosophy of Law (1921) 133; cf. 121.] That thesis assumes that the jurors, understanding what the judge told them about the substantive legal rules, proceed with consummate skill and cunning to devise the exact finding of facts which, when correlated with those rules, will logically compel the judgment the jurors desire. (3) A more realistic theory maintains that jurors often do not understand the judge's instructions and simply bring in an unexplained verdict for the party they favor. See Frank, Law and The Modern Mind (1930) Part One, Chapter 16, and Appendix V.

the pertinent substantive rules with sufficient particularity. Such faulty instructions, it has been said, "are the greatest single source of reversible error." [25c] Judge Rossman says: "The general verdict is responsible for the elaborate instructions given to the jury. * * * The necessity for [these] instructions creates pitfalls which may trap the trial judge and which in turn may result in new trials, appeals and reversals." [25d] In many instances, such a reversal means merely another trial at which the judge will intone to another uncomprehending jury a revised version of those legal rules.[25e] There results an enormous waste of time and money. Indeed, the prospect of a prolonged new trial undoubtedly often induces a litigant of modest means to accept an unfair settlement. The fact verdict provides an obvious escape from these wasteful or unfair consequences of the general verdict.

The finding of facts, says Sunderland, "is much better done by means of the special verdict. Every advantage, which the jury is popularly supposed to have over the court as a trier of facts, is retained, with the very great additional advantage that the analysis and separation of the facts in the case which the court and the attorney must necessarily effect in employing the special verdict, materially reduces the chance of error. It is easy to make mistakes in dealing at large with aggregates of facts. The special verdict compels detailed consideration. But above all it enables the public, the parties and the court to see what the jury has really done. * * * The morale of the jury also is aided by throwing off the cloak of secrecy, for only through publicity is there developed the proper feeling of responsibility in public servants. So far, then, as the facts go, they can be much more effectively, conveniently and usefully tried

---

[25c] Green, Judge and Jury (1930) 351. See also Orfield, Criminal Procedure From Arrest to Appeal (1947) 449; Orfield, Criminal Appeals In America (1939) 200.

[25d] Rossman, The Judge-Jury Relationship In the State Courts, 3 F.R.D. 98, 109. See Farley, Instructions to Juries, 42 Yale L.J. (1932) 194, 208, 215-216; Cornelius, Trial Tactics (1932) 291.

These reversals appear to be at war with the thesis (see note 13 supra) that the great virtue of the jury system consists of the jury's power to disregard or nullify the substantive legal rules. Perhaps, however, a defender of that thesis believes that a jury ought to know the substantive rules before it nullifies them.

Since lawyers use the trial judge's instructions about the substantive rules (instructions often unintelligible to the jurors) as traps for the judge, it is manifest that the substantive rules in general-verdict jury cases often are in large part but procedural devices. See Frank, A Plea For Lawyer-Schools, 56 Yale L.J. (1947) 1303, 1317.

It is a curious fact that many courts which refuse to reverse for (1) so-called "procedural" errors they call "harmless" nevertheless will be prompt to reverse for (2) errors in the charge to the jury about the substantive rules—although the first kind of errors (such as, e.g., improper remarks of one of the lawyers) are often matters well within

the comprehension of the jurors and may have influenced their verdict, while the second kind frequently are outside the jurors' comprehension and therefore could not have affected their judgment.

[25e] Here is where some persons believe that much law-school teaching about the substantive rules remains deficient. As Professor Llewellyn noted when addressing law students in 1930, "much of our study will be taken up with re-examining * * * instructions [to juries] * * * will be spent upon the learning of an etiquette of instructions. * * * " Llewellyn, The Bramble Bush (1930) 21.

See Frank, If Men Were Angels (1942) 82: "In fact, certain areas of the 'law,' as described in classroom and legal literature, are nothing more than painstaking studies of upper-court discussions of trial judges' instructions. To law students, the field of torts, for example, is largely made up of the words which appellate courts have permitted trial judges to say to juries; the extent to which these words have any connection with juries' decisions has so far remained a question which most professors of the 'law of torts' have made no attempt to answer. We do not suggest that there is no connection. But it is surely folly to make the study of the legal rules in the judges' charges a be-all and end-all of all legal thinking, and to ignore the fundamental issue of the practical significance of these charges."

by abandoning the general verdict and substituting the special verdict. * * * The special verdict is devised for the express purpose of escaping the sham of false appearances." [26]

When using a special verdict, the judge need not—should not—give any charge about the substantive legal rules beyond what is reasonably necessary to enable the jury to answer intelligently the questions put to them.[26a] As, accordingly, the jury is less able to know whether its findings will favor one side or the other, the appeal to the jurors' cruder prejudices will frequently be less effective. "A perverse verdict may still be returned, granted a jury clever enough to appreciate the effect of its answers, and to shape them to harmonize with its general conclusions. But it is much more difficult * * * and by requiring the jury to return. the naked facts only we may fairly expect to escape the results of sympathy, prejudice and passion." [26b] That may be too sanguine a hope; but the fact verdict may often reduce the more undesirable sway of emotions. It is suggested, too, that a special verdict "searches the conscience of the individual juror, as a general verdict does not," because "such are the contradictions in human nature that many a man who will unite in a general verdict for a large and unwarranted sum of money will shrink from a specific finding against his judg-

ment and sense of right and wrong." [26c] Judge Rossman writes, "Bearing in mind that in the judge-jury relationship both members of the team are entitled to fair treatment, may we not ask ourselves: Is it fair to require a jury to employ a general verdict? Since recourse to the special verdict is available, is it right to demand that a juror swear that he will obey the instructions (which the lawyers frequently say they are not sure of until they have been transcribed) and return a general verdict in obedience thereto?" [26d]

True, the common-law type of special verdict, when utilized in this country, frequently caused so many complications that it fell into disrepute.[27] But in three states, North Carolina, Wisconsin and Texas, the special-verdict practice in civil cases was so modified as to avoid most of those complications.[27a] The Wisconsin and Texas procedures, apparently the most effective,[28] seem to have been the model for Rule 49(a) of the Federal Civil Rules of Procedure, 28 U.S.C.A. following section 723c, which authorizes the trial judge to dispense with a general verdict and, instead, to require the return of special written findings. Rule 49(b) also authorizes the judge to call for a general verdict accompanied by written interrogatories.[29] But, unlike the Texas trial judge, the federal district judge, under the Rule, has full, uncontrolled discretion in the matter:

[26] Sunderland, loc. cit. See Carroll v. Bohan, 43 Wis. 218, 221 to the effect that special verdicts tend to "dispel the occasional darkness visible of general verdicts."

[26a] See Green, loc. cit., 358, 369, 370; 64 C.J. 615, 616; Nordbye, Use of Special Verdicts, 2 F.R.D. 138, 139, 140, 141; McCormick, Jury Verdicts upon Special Questions in Civil Cases, 2 F.R. D. 176.

[26b] Clementson, Special Verdicts and Special Findings by Juries (1905) 12.

[26c] Clementson, loc. cit., 15. See Chamberlayne, loc. cit., §§ 95, 100; cf. Morrow v. County of Saline, 21 Kan. 484, 503, 504.

[26d] Rossman, loc. cit., 109. See Chamberlayne, loc. cit., § 96.

[27] See, e.g., Dobie, The Federal Rules of Civil Procedure, 25 Virginia L.Rev. 261, 287 (1939).

[27a] See Green, Judge and Jury (1930) 350.

In several states, special verdicts are used in criminal cases. See A.L.I. Code of Criminal Procedure (1931) 1000, 1002; 23 C.J.S., Criminal Law, § 1399. As to special verdicts in criminal actions in the federal courts, see United States v. Wilson, Fed.Cas.No.16,730, 28 Fed. Cas. 699, at page 712; United States v. Noble, 3 Cir., 155 F.2d 315, 317 note 3.

[28] Green, loc. cit., 372, 373; Dobie, loc. cit., 287.

[29] As to interrogatories, see Wicker, Special Interrogatories to Juries in Civil Cases, 35 Yale L.J. (1926) 296; Green, loc. cit., 354, 355.

Clementson, Special Verdicts and Findings By Juries (1905) 45, 46, says: "The submission of interrogatories * * * is a sort of 'exploratory opening' into the abdominal cavity of the general verdict * * * by which the court determines whether the organs are sound and in place and the proper treatment to be pursued."

He may still require merely the old-fashioned general verdict.[30]

Accordingly, we cannot hold that a district judge errs when, as here, for any reason or no reason whatever, he refuses to demand a special verdict, although we deem such a verdict usually preferable to the opaque general verdict.[30a] Perhaps some day soon Rule 49 will be amended to make compulsory either special verdicts or written interrogatories in civil jury cases. Meanwhile, we can but hope that, in such cases, the district judges will require one or the other, on their own motion or when asked to do so.

The fact verdict will furnish no panacea.[31] Among other things, as previously noted, it will still be true that, in a rela-

---

[30] Marcus Loew Booking Agency v. Princess Pat, 7 Cir., 141 F.2d 152, 154; Cohen v. Travelers Ins. Co., 7 Cir., 134 F.2d 378, 384; Van Pelt v. United States, 6 Cir., 134 F.2d 735, 740; S. S. Kresge Co. v. Holland, 6 Cir., 158 F.2d 495, 499; Car & General Ins. Corp. v. Cheshire, 5 Cir., 159 F.2d 985, 988; Home Ins. Co. v. Tidal Co., 2 Cir., 140 F.2d 211, 213.

Defendant's counsel misreads New York Central & H. R. R. Co. v. Banker, 2 Cir., 224 F. 351, which expressed a preference for special verdicts in cases under the Employers' Liability Act, 45 U.S.C.A. § 51 et seq., but did not reverse for failure to require such a verdict.

[30a] Defendant's request here included questions as to the "negligence" of the parties. The answer to such a question involves, at least theoretically, the application of a substantive legal rule to the facts as found. See Barbarino v. Stanhope S. S. Co., 2 Cir., 151 F.2d 553, 555; Kreste v. United States, 2 Cir., 158 F.2d 575, 577, 578. It might be possible, in a negligence case, to put purely fact questions which would not call on the jury to apply a substantive legal rule.

[31] Trial-court fact-finding is difficult art. As Wignore says, it means "solv-a complex mass of evidence in contentious litigation," and requires the coordination of evidence heard under distracting circumstances. See Wigmore, Principles of Judicial Proof (1913) 3, 747, 748.

This coordination plainly has peculiar difficulties for men untrained in that art, men placed, as jurymen are, in unaccustomed conditions—in the jury-box and and jury-room—by no means conducive to calm deliberation. Twelve judges would not find it easy to reach a satisfactory joint conclusion were they treated as we treat jurors.

Recognizing the difficulties, Judge Knox said that, "to accomplish justice," we must have jurors "with intelligence, sound judgment, and courage that will enable them to decide intricate questions of fact * * *" See testimony, June 12 and 13, 1945, before House Committee on the Judiciary (on H.R. 3379, 3380 and 3381) 9, 12. Judge Otis insisted that the task calls for jurors who have the "capacity quickly to comprehend the applicable law and intelligently to apply it." See Otis, Selecting Federal Court Jurors. Both those judges suggested that jurymen with such capacities will be procured by providing higher standards for jury service and in "hand-picking" those eligible for that service.

One may well be skeptical of the efficacy of such a remedy. Nor will it do the trick to distribute brief handbooks for jurors or to have the judge briefly lecture the panel about jurors' functions. The system adopted in the Superior Court of Los Angeles County, California, is more promising. There prospective jurors receive a written test; they must pass this test and also show their aptitudes in oral interviews. But, even that device would seem insufficient. A more thoughtful proposal is that we establish detailed courses in "schools for jurors." See Judge Galston, Civil Jury Trials and Tribulations, 29 Am.Bar Ass'n, J. (1943) 195.

Nor can juries come near ascertaining the actual facts of cases as long as we retain the numerous exclusionary evidence rules. Judge Learned Hand (loc. cit.) after stating that he was "not enamored of jury trials, at least in civil cases," went on to say, "but it is entirely inconsistent to trust them as reverently as we do, and still surround them with restrictions which, if they have no rational validity whatever, depend upon distrust." Says Boston: "But our law * * * requires that all matters for consideration of the jury shall be, as it were a sort of predigested food for mental invalids; and so it strains this food * * * through the most highly developed rules of evidence, which have been evolved by reflections of party trained metaphysicians on the operations of the human mind * * * In short, we recognize in every imaginable way that the jury is the weakest element in our judicial system, and yet we ponder to it as a sacred institution. We treat a jury as a sacred institution, and we regard it, in all ways in which our regard can be

tively simple case, the jury will still be able to foresee what answers to the questions will produce a judgment for the side it favors. There is this, too, to consider: Some persons oppose the requirement that trial judges in non-jury cases shall file special findings of fact.[32] As such findings closely resemble a jury's special verdict,[33] it is therefore pertinent here that some of those opponents suggest, in effect, that a trial judge's decision is a unique composite reaction to the oral testimony, a composite which ought not—or, rather, cannot without artificiality—be broken down into findings of fact and legal conclusions.[34] Back of this suggestion there lurks something like the notions of gestalt psychology:[35] A judge's reaction to the evidence at a trial is apparently considered a "whole" (a "gestalt" or "pattern") which cannot adequately be analyzed. Separation of a decision into "law" and "fact" components, it seems to be asserted, will be "too logical," in the sense that it excludes the "intuition of experience which outruns analysis and sums up many unnamed and tangled impressions, impressions which may lie beneath consciousness without losing their worth."[36] Some sup-

measured, as wholly incompetent for the purpose for which we establish it." Boston, Some Practical Remedies For Existing Defects In The Administration of Justice, 61 Un. of Penn.L.Rev..(1912) 1.

[32] Sunderland, Findings of Fact and Conclusions of Law, 4 Un. of Chicago L.Rev. (1937) 218; Davis v. Boston Elevated Ry. Co., 235 Mass. 482, 494, 126 N.E. 841, 842, 843; cf. Guiseppi v. Walling, 2 Cir., 144 F.2d 608, 622, 155 A.L.R. 761.

[33] Sunderland, Findings of Fact and Conclusions of Law, supra.

[34] Thus Judge McClellan, in discussing new federal criminal Rule 23(c), which requires a judge in a non-jury criminal case to make special findings of fact when so requested, said: "We all know, don't we, that when we hear a criminal case tried, we get convinced of the guilt of the defendant or we don't; and isn't it enough if we say guilty or not guilty, without going through the form of making special findings of facts designed by the judge—unconsciously, of course—to support the conclusions at which he arrived?" Federal Rules of Criminal Procedure With Notes and Proceedings of the Institute of the New York University School of Law (1946) 173.

[35] See, e. g., Koffka, Gestalt, 6 Encyc. of Soc. Sciences (1931) 642, for citations; see also George, The Scientist in Action (1938) 120, 128, 133, 134, 264, 334; Riechenbach, Experience and Prediction (1938) 100, 220, 221.

The essential idea is ancient, traceable at least as far back as Aristotle; cf. Aristotle, On the Parts of Animals, I, 641a, 1417; see McKeon, Aristotle's Conception of the Development and the Nature of Scientific Method, 8 J. of History of Ideas (1947) 3, 14.

Akin to the gestalt thesis are the theses of the "functional anthropologists"; of those who study human behavior in terms of the "total situation"; of the "institu-

tional" economists; and of those who advocate "the functional approach" to the judicial process. See, e. g., Benedict, Patterns of Culture (Penguin ed., 1946); Rice, Methods in Social Science (1931) 55, 549, 553–554; Ogden, Structural Psychology and the Psychology of Gestalt, in the same volume, 109, 113–117; Lynd, Knowledge For What? (1945) Ch. VIII; Gambs, Beyond Supply and Demand (1946) 25, 74–75, 81; Cohen, Transcendental Nonsense and The Functional Approach, 35 Col.L.Rev. (1935) 809.

With reference to gestalts in trial courts and administrative agencies, see Timberg, Administrative Findings of Fact, 27 Wash.Univ.L.Q. (1941) 62, 65; dissenting opinion in Old Colony Bondholders v. New York, N. H. & H. R. Co., 2 Cir., 161 F.2d 413, 431, 449; In re Fried, 2 Cir., 161 F.2d 453, 463 note 28; Malone, The Formative Era of Contributory Negligence, 41 Ill.L.Rev. (1946) 151, 170, 179; Frank, Words and Music: Some Remarks on Statutory Interpretation, 47 Col.L.Rev. (1947) 1259, 1277 and note 76; Frank, A Plea for Lawyer-Schools, 56 Yale L.J. (1947) 1304, note 8.

[36] Holmes, J., in Chicago, B. & Q. Ry. Co. v. Babcock, 204 U.S. 585, 598, 27 S.Ct. 326, 51 L.Ed. 636. Cf. Perkins v. Endicott Johnson Corporation, 2 Cir., 128 F.2d 208, 221 and note 49.

For discussion of the difficulty of nicely separating "law" and "facts," and as to interactions between them, see Wurzel, Methods of Juridical Thinking (1904) in The Science of Legal Method (1917) 390, 396; Orfield, Criminal Appeals in America (1939) 85; Paul, Dobson v. Commissioner: The Strange Ways of Law and Fact, 57 Harv.L.Rev. (1944) 753; Isaacs, The Law and the Facts, 22 Col.L.Rev. (1922) 1, 11; Fox, Law and Fact, 12 Harv.L.Rev. (1899) 545; Thayer, A Preliminary Treatise on The Law of Evidence (1898) 183ff, 249ff; Green, Judge and Jury (1930) 270; Dickinson, Adminis-

port for this position might be sought in recent writings to the effect that logic stems from language [36a] which, in turn, because of its inherent character, cannot fully express or symbolize "feelings," and that feelings have a rational validity, expressive of "wordless knowledge," which must not be disregarded.[37] While, on net balance, however, a logical assaying by a trial judge of his decision has immense value, so that in a non-jury case special findings of fact by a trial judge are eminently desirable,[37a] the argument against special findings of fact by trial judges

---

trative Justice and The Supremacy of Law (1927) 52–55, 168–170, 203, 313–319; Morris, Law and Fact, 55 Harv.L.Rev. (1942) 1303; Cook, 'Facts' and 'Statements of Fact,' 4 Univ. of Chi.L.Rev. (1937) 233; Green, Mixed Questions of Law and Fact, 15 Harv.L.Rev. (1901) 271; Clark and Stone, Review of Findings of Fact, 4 Univ. of Chi.L.Rev. (1937) 190, 211 note 93. Compare Pound, Appellate Procedure in Civil Cases (1941) 28 with Pound, Justice According to Law, 14 Col.L.Rev. (1914) 103, 104.

[36a] The word "logic," of course, stems from the Greek word for "word."

[37] See, e. g., Langer, Philosophy In A New Key (1942), Pelican ed. (1948) passim; Sullivan, Beethoven (1927) 32–35; cf. Ortega, Concord and Liberty (1946) 61–63; MacMillan, Law and Other Things (1937) 255; Bok, I, Too, Nicodemus (1947) 319–330; Huxley, Science, Liberty and Peace (1946) 35–39; Forster, On Criticism of The Arts, Harpers' Magazine, July 1947, p. 9; Pascal, Pensees (1670) Nos. 1–4, 36, 253, 276, 282, 283, 358.

[37a] United States v. Forness, 2 Cir., 125 F.2d 928, 942, 943. "It is not a thoroughly sound objection to such articulations [i. e., analyses in terms of facts and legal conclusions] that, in so far as they attempt to analyze 'wholes,' they are 'rationalizations.' For almost all logical analyses are, in that sense, 'rationalizations.' Logic serves, among other things, to test the validity of conclusions reached by non-logical processes." Old Colony Bondholders v. New York, N. H. & H. R. Co., 2 Cir., 161 F.2d 413, 450 note 82 (dissenting opinion). See also In re Fried, 2 Cir., 161 F.2d 453, note 28.

Scientists, too, rely on intuition ("hunches") which they then articulate as premises from which they reason logically (i. e., mathematically). As to the "hunch" element in all sorts of thinking, including that of scientists and mathematicians, see, e. g., Wallas, The Art of Thought (1925) 80ff; Wallas, The Great Society (1914) 180–182; Poincare, Science and Method (1914) 75; Leuba, Psychology of Religious Mysticism (1925) 240ff; Lewis, The Anatomy of Science (1925) 90ff; Frank, Law and The Modern Mind (1930) 169;

Bell, Men of Mathematics (1937) 547–552; Montmassari, Invention and Discovery (1942); Benjamin, Introduction to the Philosophy of Science (1937) 176ff; Porterfield, Creative Factors in Scientific Research (1941) 97ff; Cairns, Theory of Legal Science (1941) 57–60; Cannon, The Way of An Investigator (1945) Chapter V.

However, it will not do to push too far the analogy between scientific thinking and the decisional process of a trial judge in reacting to conflicting oral testimony. For the trial judge's reactions to witnesses unavoidably involve a large emotional element. With respect to those reactions, the following may be pertinent:

Langer, loc. cit., 18, 19: The "basic concepts of physical science * * * have delivered all physical nature into our hands. But strangely enough, the so-called 'mental sciences' have gained very little from the great adventure. One attempt after another has failed to apply the concept of causality to logic and aesthetics, or even sociology and psychology. Causes and effects could be found, of course, and could be correlated, tabulated and studied; but even in psychology, where the study of stimulus and reaction has been carried to elaborate lengths, no true science has resulted. No prospects of really great achievement have opened before us in the laboratory. If we follow the methods of natural science our psychology tends to run into physiology, histology, and genetics; we move further and further away from those problems which we ought to be approaching. That signifies that the generative idea which gave rise to physics and chemistry and all their progeny—technology, medicine, biology—does not contain any vivifying concept for the humanistic sciences. The physicist's scheme, so faithfully emulated by generations of psychologists, epistemologists, and aestheticians is probably blocking their progress, defeating possible insights by its prejudicial force. The scheme is not false—it is perfectly reasonable—but it is bootless for the study of mental phenomena."

Pascal, Pensees (1670); "Those who are accustomed to judge by feeling do not understand the process of reasoning, for they would understand at first sight,

might perhaps be applied with somewhat greater effectiveness against fact verdicts by juries: It might be said that some *one* person or body, either a trial judge or a jury, should be entrusted in each case with reaching a composite reaction to the evidence, and that therefore a division of functions into explicit fact-finding by a jury and "law-finding" by a judge will yield an undesirable artificiality. Nontheless, even assuming that that argument has some cogency, fact verdicts seem clearly better than general verdicts.[38]

Affirmed.

L. HAND, Circuit Judge (concurring).

 I concur in holding that there was evidence to support the verdict, and that it was not an error to refuse to take a special verdict along with the general verdict. I also concur in thinking that it would be desirable to take special verdicts more often. True, it would often expose the general verdict to defeat by showing how irrational had been the operation of the juror's minds. However, like my brother Frank, I am not among those who appear to esteem the system just because it gives rein to the passional element of our nature, however inevitably that may enter all our conclusions. I should like to subject a verdict, as narrowly as was practical, to a review which should make it in fact, what we very elaborately pretend that it should be: a decision based upon law. In criminal prosecutions there may be, and in my judgment there are, other considerations which intervene to make such an attempt undesirable.

SWAN, Circuit Judge (concurring).

I concur in affirmance of judgment.

---

and are not used to seek for principles. And others, on the contrary, who are accustomed to reason from principles, do not at all understand matters of feeling, seeking principles, and being unable to see at a glance * * * For it is to judgment that perception belongs, as science belongs to intellect. Intuition is the part of judgment, mathematics of intellect * * * Two extremes: to exclude reason, to admit reason only * * * The heart has its reasons, which reason does not know * * * We know truth, not only by the reason, but also by the heart * * * And reason must trust these intuitions of the heart * * * The heart has its own order; the intellect has its own, which is by principle and demonstration. The heart has another * * * The internal war of reason against the passions has made a division of those who would have peace into two sects. The first would renounce their passions and become gods; the others would renounce reason, and become brute beasts * * * Man is neither angel nor brute, and the un-

fortunate thing is that he who would act the angel acts the brute."

Frank, Fate and Freedom (1945) 324: "We may ask whether" any one "can write a scientific description of, or reduce to a mathematical equation, the kiss of his beloved, the taste of cool water, the cry of his sick child, the tang of a brisk autumn day, the torture of physical pain, the anguish at the death of a dear friend."

[38] For expressions of approval of special verdicts by federal courts, see Zauderer v. Continental Casualty Co., 2 Cir., 140 F.2d 211, 213; New York Central & H. R. R. Co. v. Banker, 2 Cir., 224 F. 351, 354; Phillips Petroleum Co. v. Bynum, 5 Cir., 155 F.2d 196, 199; Pacific Greyhound Lines v. Zane, 9 Cir., 160 F.2d 731, 737 note 7; cf. Walker v. New Mexico & Southern Pac. R. Co., 165 U.S. 593, 597, 17 S.Ct. 421, 41 L.Ed. 837; Grand Trunk Western Ry. Co. v. Lindsay, 7 Cir., 201 F. 836, 842.

Fact-verdicts by *advisory* juries may be of considerable value in certain kinds of cases. See Arnstein v. Porter, 2 Cir., 154 F.2d 464, 473.