United States Court of Appeals
**FOR THE EIGHTH CIRCUIT**

_____

No. 97-1205
_____

| | |
|---|---|
| Sandra Gail Davis, Debtor-in-Possession; Earl Davis, Debtor-in-Possession, | * * * |
| | * |
| Appellees, | * * |
| | * |
| v. | * * |
| | |
| Ford Motor Company, | * * |
| | |
| Appellant. | * * |
| | * |

_____

No. 97-1250
_____

Ford Motor Company,

        Appellee,

    v.

Sandra Gail Davis, Debtor-in-Possession; Earl Davis, Debtor-in-Possession,

        Appellants.

Appeal and Cross-Appeal from the United States District Court for the Western District of Arkansas.

_____

Submitted: September 8, 1997
Filed: October 17, 1997
_____

Before McMILLIAN, BRIGHT and MURPHY, Circuit Judges.
_____

BRIGHT, Circuit Judge.

Sandra Gail Davis ("Davis") sustained severe injuries when her 1991 Ford Explorer vehicle rolled over her leg, notwithstanding its transmission was in a park position. In her claim against the Ford Motor Company ("Ford"), the jury awarded her $1.2 million in a general verdict. Ford admitted the vehicle was defective and the defect caused the accident, but it asserted Davis' negligence in disregarding warnings to set her parking brake contributed to the accident and that such issue should have been submitted by the trial court to the jury on a special verdict form, rather than by way of the general verdict form. We reject this contention of error and affirm.[1]

## I. BACKGROUND

On May 16, 1992, Davis' 1991 Ford Explorer rolled over her left leg while the transmission was in the park position. Davis' injuries required extensive medical treatment including four hospitalizations totaling fifty-five days, seven surgeries, thirty-nine debridement procedures, twenty-five physician visits, fifty-six home health care visits, fifty-three physical therapy treatments and treatment with forty-two different medications. Davis' medical expenses totaled $116,942.10. Two doctors testified for

_____

[1]Davis filed a cross-appeal but chose not to argue her cross-appeal. Therefore, this opinion does not discuss the cross-appeal filed by Davis and it is deemed dismissed.

Davis that she would be hospitalized one to two times per year for approximately two weeks for treatment of recurrent infections.

Davis had approximately 60,000 miles on her Explorer at the time of the accident and testified that she had never experienced any problem with the parking gear. Davis introduced evidence showing the accident occurred while the vehicle was parked on a slope of 3.5%.

Davis put forth substantial evidence on the subjects of product defect, Ford's negligence, causation, and Davis' damages. One Ford engineer testified by deposition that the defect in Ford vehicles caused an "unacceptable" and "unreasonable" risk of danger. The expert also testified that Ford knew vehicle owners commonly rely exclusively on the park mechanism to hold their vehicles in place. Ford's documents also revealed that there were 1,547 reported "roll in park" incidents on vehicles with A4LD transmissions. Ford's engineers acknowledged that Ford, after the investigation began in 1990, continued to manufacture and sell vehicles with the defective transmissions until October 1991.

Ford, although admitting liability, submitted evidence that Davis ignored four warnings to set the parking brake when parking. Ford further argued that Davis could have improved the strength and range of motion of her leg had she done aggressive physical therapy. Ford sent Davis in 1993 to an orthopedic surgeon in Denver, who advised aggressive physical therapy that Davis did not pursue.

Ford requested a special verdict that would allocate fault between Davis and Ford and assess Davis' total damages. Ford's Proposed Interrogatory 2 would have asked the jury "[d]o you find from a preponderance of the evidence that there was negligence on the part of Plaintiff, Sandra Gail Davis, which was a proximate cause of her injuries and damages?" Ford's Proposed Interrogatory 3 would have required the jury to "[u]sing 100% to represent the total responsibility for the occurrence and any

injuries or damages resulting from it, apportion the responsibility between [Davis and Ford]." Ford's fourth proposed interrogatory would have then asked the jury to state the amount which would compensate Davis for damages caused by Ford. App. at 30A-32A.

The district court denied Ford's request for a special verdict. The district court instructed the jury on the principles of comparative fault as applicable in Arkansas. Arkansas uses modified comparative fault whereby Davis would recover nothing if her fault is equal to or greater than Ford's fault. The general verdict form submitted to the jury included two questions regarding Davis' claim for compensatory damages:

> 1. On the claims of Sandra Gail Davis against Ford Motor Company, we find in favor of:
>
> _____
>
> Sandra Gail Davis     or        Ford Motor Company
. . . .

> 2. We, the jury, assess damages in favor of Sandra Gail Davis in the amount of: $_____

Add. at 123.

## II. DISCUSSION

Ford argues that the district court abused its discretion by refusing to submit the requested special verdict. Pursuant to Federal Rule of Civil Procedure 49, the decision whether to use a special verdict is vested in the district court. This discretion of the trial court has been seen by appellate courts as "not ordinarily reviewable." See, e.g., Jarrett v. Epperly, 896 F.2d 1013, 1020 (6th Cir. 1990); Lummus Indus., Inc. v. D.M. & E. Corp., 862 F.2d 267, 273 (Fed. Cir. 1988). The Eighth Circuit has cited text-

book authority that the decision to use a general verdict accompanied by  interrogatories is committed to the unreviewable discretion of the trial judge.[2]  Flanigan v. Burlington Northern, Inc., 632 F.2d 880, 884 (8th Cir. 1980), cert. denied, 450 U.S. 921 (1981) (quoting 9 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure: Civil § 2511 (1971)).

Ford has failed to show any possible prejudice from the decision to use a general verdict.  Specifically, although Ford complains that the general verdict was confusing, we conclude that the verdict form and the jury instructions were not unclear.  In addition, during closing argument Ford used an overhead projector to further explain Arkansas' comparative negligence principles.  The district court instructed the jury on Arkansas comparative fault using Arkansas Model Jury Instruction 2115.

Ford does not complain about the amount of the award.  In fact, the amount of compensatory damages awarded is substantially less than the amount advanced by Davis.  In all likelihood, this reflects the jury allocated some degree of responsibility to the plaintiff.  Ford admitted liability and the evidence presented by Davis showed damages exceeding $2.5 million.  Ford conceded in its brief that the evidence supported a finding of at least 51% fault against it. (Ford Br. at 20).  The record in other respects indicates that the use of a general verdict did not prejudice Ford.

In order to determine the amount of compensatory damages needed by Davis to live with her injury, both parties presented life care plans.  The life care plans included costs for future medical care, medications, therapeutic modalities, durable medical needs, supplies, home support care, transportation, and architectural renovations but the plans differed dramatically in cost.  Dr. Terry Winkler, a physical rehabilitation

---

[2]Of course such ruling is subject to review on appeal.  Upon review, the Flanigan court found no error in the ruling.  When this court reviews the decision to use a general verdict, great deference is afforded the district judge under Rule 49.

medicine physician certified in the area of life care planning, presented a life care plan on behalf of Davis, that totaled $2,411,941. Ford presented a life care plan by Des Rubano, that totaled $1,618,207. Ford also presented a plan based on the assumption that Davis' condition improved with extensive therapy so that Davis would no longer need a wheelchair and could return to employment. The cost for the third life care plan was $529,735.

Davis had an economist testify that Davis' lost earnings capacity would be $240,857 based on women with tenth grade educations. Davis' economist combined the present value of the life care plan by Dr. Winkler, the medical bills and the lost earnings capacity to find Davis' total economic loss was $2,528,579.

With compensatory and punitive damages, Davis requested the jury to award her $6,002,099. In closing argument, Ford suggested that the $3.5 million requested for compensatory damages was excessive by comparing that amount to the budget for Ouachita County for 1997 which was $2,700,000. In closing argument, Ford did not specify any view of reasonable damages.

In light of the evidence and arguments presented by both parties, the amount of damages awarded to Davis indicates the jury may have reduced the plaintiff's total damages by applying comparative negligence principles.

Ford argues that the district court abused its discretion because there is overwhelming support for the use of special verdicts interrogatories allocating fault in comparative fault cases. See Skidmore v. Baltimore & O.R. Co., 167 F.2d 54 (2d Cir.), cert. denied, 335 U.S. 816 (1948); Russo v. Rifkin, 497 N.Y.S.2d 41 (App. Div. 1985). Judge Frank in Skidmore called the general verdict "as inscrutable and essentially mysterious as the judgment which issued from the ancient oracle of Delphi." 167 F.2d at 60. A New York court in Russo discussing the advantages of a special verdict said:

Whatever the acceptability of such determinations [general verdicts] in less complicated times, in this era of complex issues and comparative fault, the necessity that appellate bodies be provided with some illumination of the jury's rationale has been rendered quite acute. In providing that illumination, the special verdict has the advantage of offering a more precise definition of the jury's finding . . . and it is for that reason that the appellate judiciary and legal commentators have repeatedly suggested that special verdicts or general verdicts with interrogatories be utilized in comparative fault cases.

Russo, 497 N.Y.S.2d at 43 (internal citations omitted).

We recognize that many courts advocate the use of special verdicts.[3] Nevertheless, there is another side to the argument. Judge Henry Woods, previously a leading Arkansas trial attorney and now an experienced federal district judge in the Eastern District of Arkansas, states in his treatise on comparative fault:

---

[3]Several states require interrogatories or special verdicts in all cases, either by statute, court rule, or decision. The Uniform Comparative Fault Act requires interrogatories or special verdicts unless all parties agree to a general verdict. Three states only allow general verdicts. See Henry Woods & Beth Deere, Comparative Fault §18:1 (3d ed. 1996).

Other courts have recognized the overwhelming support of the use of special verdicts while finding no abuse of discretion in the use of a general verdict. See Hammerquist v. Clarke's Sheet Metal, Inc., 658 F.2d 1319, 1323 (9th Cir. 1981) ("Mere custom to the contrary does not signal an abuse of discretion."); Railroad Dynamics, Inc. v. A. Stucki Co., 727 F.2d 1506, 1514-15 (Fed. Cir. 1984) ("When and if Rules 49, 50, and 51, Fed.R.Civ.P., are repealed, there may be room for the restriction of juries to a fact finding role and for prohibition of general verdicts in patent or other types of jury trials. Until that day, a prohibition of general verdicts . . . cannot be accomplished by judicial fiat.").

More than thirty-five years of trial experience under both the pure and modified systems of comparative negligence, and having cases submitted on both general verdicts and interrogatories have convinced the writer that in many cases a general verdict is preferable. Particularly is this true in two-party case. Juries have less trouble with a general verdict than with interrogatories. It more nearly effectuates their wishes.

Henry Woods & Beth Deere, Comparative Fault §18:1 (3d ed. 1996).

In Arkansas, most cases are submitted on general verdicts.[4] This is true even when there are multiple parties, cross claims and counterclaims. Judge Woods describes the use of special verdicts in federal court in the following passage:

Since the use of special verdicts and interrogatories is procedural, the federal courts may use them, regardless of state statutes or practice. For instance, interrogatories are sometimes used in comparative negligence cases in the Mississippi federal courts, but never in state court. As a general rule the federal courts will follow local practice. In Arkansas where general verdicts are also widely used in state practice, they are widely used in federal practice.

Id. at §18:3.

Special verdicts are valuable in many cases. However, good reasons may exist to use a general verdict in some cases. The decision is left to the discretion of the trial court under Rule 49.

---

[4]Like federal courts, Arkansas leaves the decision whether to use a general verdict to the discretion of the trial court. Hough v. Continental Leasing Corp., 630 S.W.2d 19, 21-22 (Ark. 1982).

## III.  CONCLUSION

The record shows no prejudice to Ford in the use of the general verdict.  Under these circumstances, no abuse of discretion is demonstrated in the use of a general verdict here.  Accordingly, we affirm.

McMILLIAN, Circuit Judge, concurring.

I concur.  I write separately only to encourage the district judges in this circuit to exercise their discretion to submit special verdicts in civil cases, especially those involving comparative fault issues.  As noted in <u>Skidmore v. Baltimore & O. R.R.</u>, 167 F.2d 54, 61 (2d Cir. 1948) (Frank, J.), "the general verdict . . . confers on the jury a vast power to commit error and do mischief by loading it with technical burdens far beyond its ability to perform, by confusing it in aggregating instead of segregating the issues, and by shrouding in secrecy and mystery the actual results of its deliberations." Moreover, "when a jury returns an ordinary general verdict, it usually has the power utterly to ignore what the judge instructs it concerning the substantive legal rules, a power which, because generally it cannot be controlled, is indistinguishable for all practical purposes, from a 'right.'"  <u>Id.</u> at 57-58 (footnotes omitted).  Special verdicts would lessen the secrecy and mystery as well as the threat of jury nullification.

A true copy.


Attest:


CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.